**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RUBEN ANTHONY EMERY,
          *Petitioner-Appellant,*

v.

KEN CLARK,
          *Respondent-Appellee.*

No. 08-55249

D.C. No.
CV-07-02237-
SJO(CT)

ORDER

Appeal from the United States District Court
for the Central District of California
S. James Otero, District Judge, Presiding

Argued and Submitted
December 10, 2009—Pasadena, California

Filed May 13, 2010

Before: Cynthia Holcomb Hall and Barry G. Silverman,
Circuit Judges, and Suzanne B. Conlon, District Judge.*

**COUNSEL**

Vivian A. Fu, San Francisco, California, for the petitioner-
appellant.

James William Bilderback, II, Supervising Deputy Attorney
General, Los Angeles, California, for the respondent-appellee.

*The Honorable Suzanne B. Conlon, United States District Judge for
the Northern District of Illinois, sitting by designation.

## ORDER CERTIFYING DETERMINATIVE
## QUESTIONS OF STATE LAW
## TO THE CALIFORNIA SUPREME COURT

HALL, Circuit Judge:

We respectfully ask the Supreme Court of California to exercise its discretion to decide the certified questions set forth below pursuant to rule 8.548 of the California Rules of Court.

### I.   Administrative Information

We provide the following information in accordance with rule 8.548(b)(1) of the California Rules of Court:

The title of the case is Ruben Anthony Emery, Petitioner-Appellant v. Ken Clark, Respondent-Appellee, and it is assigned Ninth Circuit Case No. 08-55249.

The name and address of counsel for Petitioner Emery is Vivian A. Fu, P.O. Box 460374, San Francisco, California 94146.

The name and address of counsel for Respondent Clark is James William Bilderback, II, Supervising Deputy Attorney General, Office of the California Attorney General, 300 S. Spring St., Los Angeles, California 90013.

If the California Supreme Court grants this request for certification, state prisoner Ruben Anthony Emery should be deemed the petitioner. After being convicted of special circumstances murder and attempted robbery with criminal street gang enhancements, and exhausting his direct appeal and state habeas remedies, Emery filed a petition for writ of habeas corpus in the United States District Court for the Central District of California, Case No. CV-07-02237-SJO(CT). He thereafter obtained a certificate of appealability pursuant

to 28 U.S.C. § 2253(c) and Ninth Circuit Rule 22-1(d), and timely filed a notice of appeal in this court. Emery is, thus, the petitioner and appellant before our court.

## II.   Certified Questions of State Law

We certify to the California Supreme Court the following questions of state law that are now before us, and as to which there is no controlling authority:

1.   Does California's criminal street gang enhancement statute, in particular the element of "specific intent to promote, further, or assist in any criminal conduct by gang members" in California Penal Code section 186.22(b)(1),[1] require proof that the defendant specifically intended to promote, further, or assist in *other* criminal gang activity, apart from the offense of conviction? *See Garcia v. Carey*, 395 F.3d 1099, 1100-01, 1103-04 (9th Cir. 2005); *Briceno v. Scribner*, 555 F.3d 1069, 1078-83 (9th Cir. 2009); *cf. People v. Romero*, 140 Cal.App.4th 15, 19 (2006); *People v. Hill*, 142 Cal.App.4th 770, 774 (2006); *People v. Vazquez*, 178 Cal.App.4th 347, 353-55 (2009).

2.   Is gang expert testimony tied to the facts of the case—regarding the centrality of "respect" in gang culture, and how the defendant's use of lethal force to avenge a minor slight to a member of an affiliated gang would enhance the "respect" he gets from other gang members, raise his status within the gang hierarchy, and teach the community not to interfere with even the most minor criminal activities of his fellow gang members—sufficient to satisfy the requirement that the murder was committed with the "specific intent to promote, further, or assist in any criminal conduct by gang members" within the meaning of section 186.22(b)(1)? *See Vazquez*, 178 Cal.App.4th at 350-51, 353-55; *Hill*, 142 Cal.App.4th at 772,

---

[1]All further undifferentiated section references are to the California Penal Code.

774; *cf. People v. Gardeley*, 14 Cal.4th 605, 612-13, 619 (1997); *but see Briceno*, 555 F.3d at 1078-79.

3. Does evidence that the defendant committed the attempted robbery and murder *in concert with* the brother of a young gang member, whom the victim allegedly "disrespected," satisfy the requirement that the crimes were committed with the specific intent to "*assist in* any criminal conduct by gang members" within the meaning of section 186.22(b)(1)? *People v. Villalobos*, 145 Cal.App.4th 310, 322 (2006); *Romero*, 140 Cal.App.4th at 19-20; *People v. Morales,* 112 Cal.App.4th 1176, 1198 (2003); *see also Briceno*, 555 at 1084-86 (Wardlaw, J., dissenting); *cf. Briceno*, 555 F.3d at 1081, n.4.

The phrasing of the questions set forth above should not restrict the California Supreme Court's consideration of the issues involved in this matter, and that Court may reformulate the questions. We will accept the decision of the California Supreme Court on any of these questions, each of which could determine the outcome of this matter. *See Aceves v. Allstate Ins. Co.*, 68 F.3d 1160, 1164 (9th Cir. 1995) (holding that the Ninth Circuit is bound by the California Supreme Court's interpretation of California law).[2]

---

[2]We realize that the California Supreme Court currently has pending on review a case, *People v. Albillar*, Cal. Sup. Ct. No. S163905, in which the Court limited review to the following issues: "Did substantial evidence support defendants' convictions under Penal Code section 186.22, subdivision (a), and the true findings with respect to the enhancements under Penal Code section 186.22, subdivision (b)?" The Court also recently requested supplemental letter briefs on the question "whether the phrase felonious criminal conduct, appearing in Penal Code section 186.22, subdivision (a), should be interpreted to mean felonious criminal gang-related conduct."

We recognize that the California Supreme Court has plenary authority to decide any issues raised or fairly included in a petition for review or answer and, with an opportunity for briefing and argument by the parties, any issues presented by the case that are *not* raised or fairly included in

## III.   Factual and Procedural Background

Emery was convicted after a jury trial of the attempted robbery and first degree murder of Henry Chow. The jury found true the special circumstances that: (1) Emery was an active participant in a criminal street gang and the murder was carried out to further the activities of the gang, § 190.2(a)(22)); and (2) Chow was killed during a robbery, § 190.2(a)(17)(A). The jury also found that Emery committed both crimes for the benefit of, and in association with, a criminal street gang, with the specific intent to promote, further or assist in criminal conduct by gang members. § 186.22(b)(1). Finally, the jury

---

the petition. Cal. R. Ct. 8.516(b). We have reviewed the petitions for review and other briefs filed in *Albillar*, and further realize it is possible the Court will soon reach and decide one or more of the issues we are proposing for certification, regarding the proper interpretation and application of the "specific intent" element of the section 186.22(b)(1) gang enhancement.

As we read the parties' briefs, however, we do not understand the appellants in *Albillar* to be raising our first certified question, regarding the requirement for proof that the defendant specifically intended to promote, further, or assist in *other* criminal gang activity, apart from the offense of conviction, under the holding of this court in *Garcia*, 395 F.3d at 1101-04, as recently reaffirmed in *Briceno*, 555 F.3d at 1078-83. Moreover, while the appellants and the respondent in *Albillar* discuss *Briceno*, and arguably raise our second and third certified questions regarding what constitutes relevant gang expert testimony, and whether action in concert with a known gang member or associate can support a jury finding of "specific intent to . . . assist in any criminal conduct by gang members," the appellants apparently disclaim any reliance on *Garcia* and *Briceno* and suggest that the California Supreme Court need not resolve the sharp conflict between the Ninth Circuit and California Courts of Appeal on these issues. *See* Appellant's Reply Brief on the Merits (Albert A. Albillar), 2009 WL 1387615, *11-12 (filed April 20, 2009) (the "other crime" thesis from *Garcia* is not advanced by appellant); Appellant's Reply Brief on the Merits (Alex A. Albillar), 2009 WL 1541985, *1-2 (filed May 7, 2009) ("appellant has neither relied upon [*Garcia* or *Briceno*] in arguing the insufficiency of the evidence, nor is it necessary to do so"). Accordingly, we would urge the California Supreme Court to answer the certified questions presented here, notwithstanding the grant of review in *Albillar*.

found that a principal discharged a firearm, resulting in Chow's death. §§ 12022.53(d) and (e)(1). The facts upon which the jury rendered its verdict and findings are as follows.

## A. The Attempted Robbery and Murder of Henry Chow

On November 4, 2001, Leonardo Alvarez ("Leonardo"), a member of the Eastside Longos criminal street gang, lived on West Third Street in Long Beach with his brothers Danny Alvarez ("Danny"), five other siblings, and their mother, Sandra Rosales. The house on West Third Street was a hangout for members of numerous gangs, including the Westside Longos. Gang members would come to the house to drink and use drugs. Gang members would also commit acts of fraud at the house, and were initiated into the gang at that location. In November 2001, Danny was 18 years old and Leonardo was 16 or 17 years old.

Petitioner Emery, also known as "Little Man," was at the time an active member of the Westside Longos street gang. He arrived at the house on West Third at around 12:00 to 2:00 p.m. that day, carrying a black gun and wearing a bulletproof vest.

Rosales did not know Emery, and had never seen him before. She noticed he was wearing a bulletproof vest, and asked him about it. Emery had his hand in his pocket. Rosales reached out and felt something hard, like metal. Rosales told Danny she did not want Emery in her house, and told Emery to leave or she would call the police. Danny said Emery would only be there for a couple of minutes.

Emery left, but returned to the house sometime around 6:00 to 7:00 p.m. that same day. Upon Emery's return, Danny told Leonardo to go to the store to get some peanuts for Emery. Leonardo went to the Moonray Market at 605 Broadway in

Long Beach, which was owned by Henry Chow. Hue Bui, a friend of Chow, was there. When Leonardo and two or three other young Hispanic boys came to the market, Chow asked Bui to stop them from coming in. Leonardo tried to push Bui away, and they got into a scuffle. Bui grabbed Leonardo by the collar and pushed him out of the store.

Leonardo returned home about ten minutes after he left, crying and complaining that the owner of the store, an Asian male, had pushed him to the ground. Emery became enraged and said that he wanted to "go teach this motherfucker a lesson," and that he was going to rob the store owner.

On the way out of the house, Danny encountered his little sister, Jessica. Danny did not want to pursue Emery's proposed course of action, so he asked Jessica to come along, hoping her presence would deter Emery from going ahead with the robbery.

Emery, Danny, and Jessica walked to the store together. On the way, Emery reiterated that he intended to "teach this motherfucker a lesson" and rob him. Danny asked Emery not to do it, because Chow was his friend. Emery pulled out a gun and threatened Danny, asking, "Are you going to ride when I smoke the motherfucker?" Danny was afraid Emery would kill him, so he went into the store with Emery.

Emery walked into the store, and said to Chow, "Hey bitch, give me the money." Emery then shot Chow three times in rapid succession, mortally wounding him. After the shooting, Emery ran out of the store. A Black woman tripped over Danny. Danny tried to help her up, but she refused his help. A Samoan male told Danny to leave the store, so he did, taking his sister with him.

Bui grabbed a golf club to protect himself, then called out, "Hey, Henry, are you all right?" Chow said, "No, I think I got shot in the leg." Bui looked at Chow's leg, but did not see a

hole or any blood. The paramedics came and took Chow away, and he later died as a result of a gunshot wound to his chest.[3]

Danny went home after the shooting. Emery was not there, but his friend Bugsy, another Westside Longos gang member, was there. Bugsy had the gun Emery used in the shooting. Bugsy asked Danny where he should hide the gun. Danny gave Bugsy his blue jacket, and showed him where to hide the gun. They wrapped the gun in the jacket, and put it in an ice cooler in the back yard. Danny took a Valium, then left the house.

## B.    The Investigation of the Shooting

Long Beach Police Detective Hector Gutierrez was assigned to investigate the shooting at the Moonray Market. He went to the house on West Third Street looking for Emery, who was known to him as "Little Man," and found him out front. Emery was wearing a bulletproof vest, but did not have a weapon. Detective Gutierrez arrested Emery and took him to the police station.

Sometime in the late evening hours of November 4 to the early morning hours of November 5, 2001, Detective Gutierrez returned to the West Third Street house to look for witnesses. He spoke with Leonardo, Danny, and Rosales.

---

[3]According to a Los Angeles County Deputy Medical Examiner who testified at trial, Chow had five separate gunshot wounds, which were likely caused by three separate gunshots. The wounds were consistent with bullets fired from a .45-caliber automatic. Chow had been shot in the chest, back, and legs. One of the bullets caused three wounds, one to each of Chow's legs and another to his penis. All of the gunshot wounds were through-and-through, meaning that the bullet entered and exited the body. The bullet that entered Chow's chest injured his lungs and his liver. This was the fatal wound.

Leonardo told Detective Gutierrez that he had gone to the Moonray Market and attempted to "take some peanuts," and an Asian male working at the store grabbed or pushed him to the ground. Leonardo went home to tell his "big brother," Danny, what happened. Emery, who was called "Little Man," was present, and had a semiautomatic gun with him. Leonardo said Emery was a member of the Westside Longos gang. Danny and Emery got upset and agitated, and left to go to the Moonray Market.

Danny told Detective Gutierrez that Leonardo had been pushed by an Asian male. He said Little Man became angry and said something like, "Let's go smoke that fool." Danny, his sister Jessica, and Little Man walked to the market. They stopped in an alley, and Little Man pulled out a chrome revolver. Little Man told Danny, "We're going to take this ride together, or I'm going to kill you." Danny told the detective that he and Jessica stayed in the alley while Little Man went into the market. Little Man yelled something like, "Give me your money or I'm going to kill you, motherfucker." Danny heard two or three shots, then saw Little Man run out of the market and down the alley. Danny went home, then he and his brother went to visit a girlfriend.

Following this conversation, Detective Gutierrez placed Danny under arrest and took him to the police station. Later, Danny spoke with Detective Gutierrez at the jail. Danny said Leonardo had a problem with an Asian employee at the Moonray Market. Danny said that Leonardo told Emery and him about the incident, and they got "pumped up" and angry about it. Danny said that he and Emery went to the Moonray Market, where Emery shot Chow.

Danny also spoke with Long Beach Police Detective Mark McGuire. He told Detective McGuire that Emery shot Chow. However, Danny also told many lies in his conversation with Detective McGuire.[4] Danny said he does not consider himself

---

[4]At first, Danny lied when he said he did not know where the gun was, but then he told the police where to find it. Danny lied when he said that

a gang member, but admitted that he did hang out with gang members. Danny claimed to be a "tagger" with the nickname "Fear" or "Matar," which means "to kill" in Spanish. At least one defense witness, testified that he has known Danny since childhood, and he knows Danny to be a gang member.

Danny also told McGuire that he would be risking his life by testifying against Emery. At trial, Danny testified that Emery threatened him prior to the preliminary hearing by writing a note saying that someone in Danny's family would get hurt if he testified. About six months before trial, Emery's mother also threatened Leonardo, and warned him not to testify.

After his conversation with Danny, Detective McGuire went to the house on West Third Street and recovered the gun that was used to kill Chow. It was a gray .45 caliber semiautomatic handgun.

## C.   The Joint Indictment of Emery and Danny Alvarez

By information filed on February 27, 2003, Emery and Danny were charged with murder, § 187(a) (Count 1), and second degree robbery, § 211 (Count 2). With respect to Count 1, the information alleged the special circumstance that the murder was committed while the defendants were engaged in robbery. § 190.2(a)(17)(A). With respect to both counts, it

---

he was in the alley at the time of the shooting. Danny lied about taking Valium and smoking primos (marijuana cigarettes laced with cocaine base) with Emery. Danny lied when he said that Emery had a .38 revolver. Danny lied about his sister's age, saying she was eight when she was really six. Danny lied when he said that Emery was only going to see what was going on at the market, when he was really going to rob the store owner. Danny lied and said the gun was not at his house. Danny talked to Detective McGuire before he had a deal with the prosecution. Danny thought a videotape from the Moonray Market would show Emery shooting Chow.

was further alleged that Emery personally and intentionally discharged a firearm, causing great bodily injury, § 12022.53(d); that he personally and intentionally discharged a firearm § 12022.53(c); and that he personally used a firearm, § 12022.53(b). It was also alleged as to both counts that a principal personally and intentionally discharged a firearm, causing great bodily injury, §§ 12022.53(d) & (e)(1); that a principal personally and intentionally discharged a firearm, §§ 12022.53(c) & (e)(1); and that a principal personally used a firearm, §§ 12022.53(b) & (e)(1). It was further alleged as to both counts that the offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang, with specific intent to promote, further and assist in criminal conduct by gang members. § 186.22(b)(1).

Danny's case was severed from Emery's before trial, and he eventually pled guilty to voluntary manslaughter in return for his agreement to testify against Emery. Pursuant to that agreement, Danny testified at trial that the murder of Henry Chow was committed in "furtherance of a criminal street gang." On October 7, 2004, the information was amended to include the special circumstance allegation pursuant to section 190.2(a)(22)—i.e., that the murder was an intentional killing by an active member of a criminal street gang, carried out to further the activities of the gang.

### D.  The Testimony of Gang Expert Abel Morales

Detective Abel Morales, the prosecution's gang expert, testified at trial about gangs in the Long Beach area. He stated that the Westside Longos is a predominantly Hispanic gang with territory on the west side of Long Beach with approximately 300 members. The gang's primary criminal activities are drive-by shootings, burglaries, armed robberies, and murders. Their symbol is WSL and they do not claim any colors, but their preferred colors are black and white. Emery had tattoos representing the Westside Longos.

Morales further testified that Westside Stoner is a predominantly white gang in the same area with approximately 50 members.[5] Their symbol is WSS and they also prefer black and white colors. Their primary criminal activities are shootings, murders, burglaries, robberies, auto thefts, and selling narcotics. Emery also had tattoos representing the Westside Stoners.

According to Detective Morales, Eastside Longos is the largest Hispanic gang in Long Beach, with approximately 400 members. Their symbol is ESL and they also prefer black and white colors. Their primary criminal activities are murder, drive-by shootings, burglaries, robberies, extortion, witness intimidation, drug sales, and gun possession.

When questioned about the relationship between the Westside Longos and Eastside Longos, Morales explained that there had been a peace treaty between the two gangs since the early 1990s when the Mexican Mafia told them that Hispanics have to stick together and should not be fighting amongst themselves. Ever since then, he said, "they somewhat try to follow that rule." There is also some fluidity in membership between the Westside Longos and Westside Stoners.

Morales further testified about the importance of "respect" in a gang, saying, "The only thing you have in a gang is respect. Once respect is getting taken away from [you], you don't have a second chance. People look up to you because of the things you have done in the past. That's how you get respect." If someone disrespects a gang member, the gang member would retaliate because doing nothing would mean that "he have no respect." If the person disrespected was a

---

[5]Although Rosales's house and the Moonray Market both appear to be located on the "west side" of Long Beach, the Attorney General conceded at oral argument that there was no evidence or argument to the jury that the crimes were committed to defend the "turf" of either the WSL or WSS gang. Nor was there any showing that Emery wore gang colors, threw gang signs, exposed his gang tattoos, or used his gang moniker, "Little Man," while committing the attempted robbery and murder.

member of an affiliated gang or a friend, the gang member would get even more respect by "sticking up for someone else."

Morales further testified that the race of the people involved plays a "major part" and if the person who disrespected the gang member was from a different race, "you just can't let that go." According to Morales, Westside Longos, Eastside Longos, and Westside Stoners did not get along with the Asian gangs.

Morales testified, without objection, that in his opinion the murder of Henry Chow was committed in furtherance of a criminal street gang. When asked to explain, he said:

> My opinion [is] based on the fact that Mr. Emery, as you can see from the pictures, he's hard-core gang member. By him shooting the [victim] for just a simple deal that had occurred with one of Emery's friends, that shows that he had to go and do something worse than just beating him, you know, for the fact that shooting — hurt him real bad because he disrespected not only his gang by messing with one of his friends but also himself — by the person going to Emery and saying, "hey, this was done to me," he was showing that you had to go do something; by him not doing anything, he totally get disrespected.

When asked how he knew the killing was not just "a family thing," in which Emery was avenging an act of disrespect toward his friend's brother, but instead "a gang thing" in which he was retaliating against Chow for disrespecting another gang member, Morales explained:

> [F]rom my understanding from what I know is that the person [who] got disrespected was a gang member from Eastside Longo gang. Therefore, he went and told his brother, who his brother is not a gang

member, but who Mr. Emery is a gang member. By
them doing that, they had to go show and prove
something, that you can't just mess with that particu-
lar gang or any of his friends from that gang.

Finally, as to the use of lethal force "over a fight about pea-
nuts," Morales explained that Emery's actions would inspire
fear within the WSL, the WSS, the ESL, *and* in the commu-
nity, such that he could henceforth act with complete impu-
nity. Indeed, it would "shoot [him] up the ladder at the top
because if [he] could just shoot somebody for something
dumb, then he can go and do anything to anybody."

## E.   The Jury Verdict & Sentencing

A jury convicted Emery of the attempted robbery and first
degree murder of Henry Chow, with the special circumstances
that: (1) Emery was an active participant in a criminal street
gang and the murder was carried out to further the activities
of his gang, § 190.2(a)(22)); and (2) Chow was killed during
a robbery, § 190.2(a)(17). The jury also specifically found
that Emery committed both crimes "for the benefit of, at the
direction of, and in association with, a criminal street gang
with the intent to promote, further, or assist in criminal con-
duct by gang members pursuant to [section] 186.22(b)(1)."
Finally, the jury found that a principal discharged a firearm,
resulting in Chow's death. §§ 12022.53(d) & (e)(1). The jury
left blank the portions of the verdict form asking whether
Emery personally fired the weapon. §§ 12022.53(b)-(d).

The state trial court sentenced appellant to life in prison
without possibility of parole for Count 1, special circum-
stances murder. The trial court also imposed a consecutive
term of 25 years to life for the gun discharge enhancement,
and an additional consecutive 10 years as a gang enhancement
for the murder. Finally, the court imposed a concurrent term
of two years for Count 2, attempted robbery. The special cir-
cumstance finding pursuant to section 190.2(a)(22), and the

gang enhancements imposed pursuant to section 186.22(b)(1) and sections 12022.53(d) and (e)(1) are at issue in this appeal.

## F.  Emery's State Court Appeal

On direct appeal, the California Court of Appeal for the Second Appellate District, Division Eight, ordered the state trial court to strike the 10-year gang enhancement imposed as to Count 1 pursuant to *People v. Lopez,* 34 Cal.4th 1002, 1004 (2005), and to correct two minor sentencing errors, but the judgment was otherwise affirmed. *People v. Emery,* No. B180005, 2006 WL 1431193 (Cal. Ct. App. May 25, 2006). In its unpublished decision, the California Court of Appeal rejected Emery's argument regarding the sufficiency of the evidence to support the gang enhancement, holding as follows:

> Here, evidence allowed the jury to find appellant murdered Chow specifically intending to promote his gang's criminal conduct. A street gang prospers by cowing local residents into not challenging the gang's domination of the neighborhood. Killing Chow, who had disrespectfully manhandled Leonardo Alvarez, a member of a related gang, taught neighborhood residents to fear the gang, and disciplined local residents to defer to gang members. Killing for even a personal slight warned residents not to trifle with the gang. In addition to the evidence permitting the jury to affirmatively find appellant committed his crimes to benefit his gang, appellant's contrary claim that he murdered Chow based on a purely personal grudge suffers from its implausibility.
>
> Appellant had known Danny Alvarez, Leonardo's brother, for only one month. Leonardo did not know appellant, having met him only once before. Despite their very casual acquaintance, appellant claimed his

outrage at the personal slight to a younger brother he did not know (Leonardo) of a companion he had known for only one month (Danny) was sufficient to make him want to kill Chow independently of any gang tie, affiliation, or purpose. The jury was free to reject that argument.

*Id*. at *2. The California Supreme Court summarily denied Emery's petition for review on September 13, 2006, *see People v. Emery*, Cal. Sup. Ct. No. S144683, and denied his final state petition for writ of habeas corpus on June 24, 2009, *see Emery (Ruben) on H.C.*, Cal. Sup. Ct. No. S172933.

### G. Habeas Corpus Proceedings in the District Court

Emery filed his federal habeas petition on April 4, 2007, raising five claims. On June 21, 2007, District Court Judge James Otero adopted a magistrate judge's report and recommendation, and denied the petition in its entirety. In rejecting Emery's claim of insufficiency of the evidence to support the gang enhancements, the district court held as follows:

After a review of the record in this case, including, but not limited to, the expert testimony of Officer Morales, this court concurs and independently finds that viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the elements of the gang special circumstance finding and the gang enhancement finding beyond a reasonable doubt.

### H. Emery's Appeal to the Ninth Circuit Court of Appeals

On July 29, 2008, this court granted a certificate of appealability of the issue as to the sufficiency of the evidence to support the gang enhancements applied in this case.[6] This

---

[6]Although the certificate of appealability referred only to the sufficiency of the evidence to support the gang enhancements as to the "robbery" and

court also granted Emery's motion for appointment of counsel on November 3, 2008. The case was fully briefed, and was argued and submitted on December 10, 2009. The parties were advised during oral argument that the panel was considering certifying the questions of state law presented in this appeal to the California Supreme Court pursuant to rule 8.548 of the California Rules of Court.

## IV.   Reasons for Certification

The sole issue raised in this appeal is whether the California state courts reasonably concluded that the evidence presented at trial was sufficient to support the jury's findings that Emery committed the attempted robbery and the murder of Henry Chow "with the specific intent to promote, further, or assist in any criminal conduct by gang members" within the meaning of section 186.22(b)(1), and "to further the activities

---

the use of a firearm by a principal in the commission of the robbery, the parties agree that the attempted robbery and murder were committed simultaneously, and the evidence supporting the convictions on Counts 1 and 2 was virtually identical. Thus, both Emery and the Attorney General have briefed the issue of the sufficiency of the evidence to support the gang enhancements as to both the attempted robbery and the murder pursuant to §§ 186.22(b), 12022.53(d) and (e)(1). Similarly, although Emery does not offer separate briefing or argument about the sufficiency of the evidence to support the "gang enhancement" embedded in the murder special circumstance for a murder carried out by an active member of a criminal street gang to "further the activities of the criminal street gang," § 190.2(a)(22), the Attorney General has acquiesced in the inclusion of that issue within the scope of Emery's appeal. Thus, we deem the parties' agreement on these points to be a joint motion to expand the certificate of appealability, and hereby grant it. We have also assumed that a failure of proof as to the "specific intent" element of section 186.22(b)(1) would apply to the section 190.2(a)(22) special circumstance, and would require that the jury's findings as to both of these provisions be vacated. As there is no separate authority interpreting the language "to further the activities of a criminal street gang," we intend the discussion of the sufficiency of the evidence of section 186.22(b)(1) specific intent to pertain as well to the § 190.2(a)(22) special circumstance.

of the criminal street gang" within the meaning of section 190.2(a)(22).**7**

For purposes of this appeal, Emery does not dispute that he was a principal in the attempted robbery and murder of Henry Chow, or that he was an active participant in a criminal street gang at the time, or that a principal discharged a firearm in the commission of those crimes. Nor does he separately dispute that the crimes were committed "for the benefit of, at the direction of, or in association with any criminal street gang." § 186.22(b)(1).

Rather, relying exclusively on two recent Ninth Circuit decisions, *Garcia v. Carey*, 395 F.3d 1099 (9th Cir. 2005), and *Briceno v. Scribner*, 555 F.3d 1069 (9th Cir. 2009), Emery contends that the prosecution was required to prove he committed the attempted robbery and murder of Chow with the specific intent to promote, further, or assist in *other* specific criminal gang activity, *apart from* the offenses of conviction, and that no rational trier of fact could have found that element of the section 186.22(b)(1) gang enhancement established beyond a reasonable doubt based on the evidence presented at trial. *See Garcia*, 395 F.3d at 1100-01, 1103-04; *Briceno*, 555 F.3d at 1078-80. Relying on *Briceno*, 555 F.3d at 1081 n.4, Emery further contends that the jury's specific intent finding cannot be sustained under California case law suggesting that by committing the crimes in concert with Danny—who was either a gang member himself, a gang associate, or the protective older brother of a member of a gang

---

**7**To prevail on an insufficiency of evidence claim under federal law, a habeas corpus petitioner must show that "upon the record evidence adduced at the trial[,] no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). An additional layer of deference is added to this standard of review by 28 U.S.C. § 2254(d), which obliges the petitioner, Emery, to demonstrate that the state court's adjudication entailed an unreasonable application of the *Jackson* standard. *See Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).

affiliated with Emery's gang—he acted with the specific intent to "*assist in* any criminal conduct by gang members" within the meaning of section 186.22(b)(1). *See People v. Vazquez*, 178 Cal.App.4th 347, 353-55 (2009); *People v. Villalobos*, 145 Cal.App.4th 310, 322 (2006); *People v. Romero*, 140 Cal.App.4th 15, 19-20 (2006); *People v. Morales,* 112 Cal.App.4th 1176, 1198 (2003).

Since *Garcia* was decided in 2005, there has developed a sharp split of authority between the California Courts of Appeal and the Ninth Circuit regarding the proper interpretation of the "specific intent" clause in section 186.22(b)(1)—a conflict that has been recognized by courts on both sides of the precedential divide. *See, e.g., Briceno*, 555 F.3d 1078-83**;** *Vazquez*, 178 Cal.App.4th at 353-55. California Courts of Appeal have repeatedly complained in both published and unpublished decisions that this court in *Garcia,* and later in *Briceno,* has misinterpreted section 186.22(b)(1). The following passage from *People v. Romero*, 140 Cal.App.4th 15 (2006) is representative:

> Relying on the majority opinion in [*Garcia* ], appellant [Romero] asserts that the statute requires a showing of intent to promote the gang's criminal activity beyond the charged crime. In *Garcia*, the Ninth Circuit found insufficient evidence of specific intent to promote, further, or assist in other criminal conduct by the defendant's gang. We disagree with *Garcia*'s interpretation of the California statute, and decline to follow it. . . . By its plain language, the statute requires a showing of specific intent to promote, further, or assist in "*any* criminal conduct by gang members," rather than *other* criminal conduct. (§ 186.22, subd. (b)(1), italics added.)

*Romero*, 140 Cal.App.4th at 19 (italics in the original; case citations omitted); *accord People v. Hill*, 142 Cal.App.4th 770, 774 (2006) (stating that *Garcia* "misinterprets California

law"). Most recently, in *Vazquez*, 178 Cal.App.4th 347, the Court of Appeal held that:

> "Like the *Romero* court, we reject the Ninth Circuit's attempt to write additional requirements into the statute. There is no statutory requirement that this "criminal conduct by gang members" be distinct from the charged offense, or that the evidence establish specific crimes the defendant intended to assist his fellow gang members in committing."

*Id*. at 354.

The views expressed by the *Romero, Hill,* and *Vazquez* courts are consistent with those of the California Court of Appeal that decided Emery's direct appeal.[8] In that unpub-

---

[8]In addition to *Romero, Hill*, and *Vazquez,* a Westlaw search discloses more than forty unpublished cases from the California Courts of Appeal that "disagree with," "decline to follow," or "recognize the disagreement" with the Ninth Circuit on this issue. It should also be noted that some California-based federal district courts, in evaluating habeas claims of insufficiency of the evidence to support section 186.22(b) gang enhancements, have been struggling with *Garcia* and *Briceno*, especially with *Garcia*'s requirement of evidence that the defendant intended to further, promote, or assist in other specific criminal activity, "apart from" that of the charged offenses. *See, e.g., Lor v. Small*, 2010 WL 935654 (E.D.Cal. Mar. 10, 2010); *Washington v. Small*, 2010 WL 785233 (C.D.Cal. Feb. 26, 2010); *Scott v. Marshall*, 2010 WL 546360 (C.D.Cal. Feb. 10, 2010); *Arroyo v. Carter*, 2010 WL 234819 (C.D.Cal. Jan. 12, 2010); *Coutee v. Walker*, 2010 WL 128338 (C.D.Cal. Jan. 7, 2010); *German v. Horel*, 2009 WL 4885195 (C.D.Cal. Dec. 16, 2009); *Mungia v. Hedgpeth,* 2009 WL 2514188 (C.D. Cal. Aug. 13, 2009); *Tarver v. Horel*, 2009 WL 2448016 (C.D. Cal. Aug. 6, 2009); *Mendoza v. Att'y Gen. of State of Cal.*, 2009 WL 926814 (E.D. Cal. Apr. 3, 2009); *Osika v. Patrick*, 2009 WL 485478 (C.D. Cal. Feb. 20, 2009). A recent law review article also provides cogent analysis of the conflict between *Garcia* and the numerous California Court of Appeal cases dealing with the specific intent issue since 2005, as well as the inconsistency of results in some California cases. Martin Baker, *Crips and Nuns: Defining Gang-Related Crime in California Under the Street Terrorism Enforcement and Prevention Act*, 40 McGeorge L. Rev. 891

lished opinion, the Court of Appeal concluded that "*Garcia* is not persuasive" in its interpretation of the specific intent required for imposition of gang enhancements, *People v. Emery*, 2006 WL 1431193 at *2, and further noted that the Ninth Circuit decision in *Garcia* was at odds with the decision of the Court of Appeal that ruled on Garcia's direct appeal. *Id.* at n.2.

## A.

A close look at the facts and holdings of *Garcia* and *Briceno* brings into focus the stark conflict between the case law of this court and the California Courts of Appeal regarding the element of "specific intent" to support a gang enhancement under section 186.22(b)(1).

In *Garcia*, the defendant was a member of a gang known as El Monte Flores, or E.M.F. *Id.* at 1101. Its "turf" or territory extended to much of the City of El Monte, including the location of a liquor store where Garcia robbed a patron of $14.85 and his bicycle. The victim, Ricardo Bojorquez, nodded toward Garcia and said, "How do you do?" Garcia responded, "You know me?" Bojorquez answered, "No, I'm just saying how are you." Garcia then said, "If you don't know me, don't be talking to me." As Bojorquez continued walking toward the counter, Garcia asked him if he had any change, and Bojorquez answered that he did not. Garcia then said, "Let's see when you come out the door." One of Garcia's companions asked Bojorquez where he was from, but Bojorquez did not answer. When Bojorquez tried to leave the store, Garcia stood in front of him and said, "I'm Little Risky

(2009). Needless to say, most of these cases are working their way through the habeas pipeline, and will soon be making their way to this court. Thus, a definitive interpretation of the "specific intent" element of the gang enhancement statute from the California Supreme Court would greatly assist both the state and federal courts, and, of course, the parties to these cases.

from E.M.F.," then asked, "you want to get jacked [robbed]?" Garcia told his companions to watch for the police, then took $14.85 from Bojorquez's shirt pocket. One of Garcia's companions lifted his own shirt and grabbed the handle of what Bojorquez thought was a pistol. Garcia told one of his companions to take Bojorquez's bicycle. After his associate did so, Garcia and his companions left the store with it. *Id.*

A gang expert from the El Monte Police Department testified that E.M.F. was the largest street gang in the city, that it was "turf-oriented," and that the robbery had occurred in the Little Five Points Area, which was part of E.M.F.'s turf. *Id.* at 1101-02. He further testified that the robbery with which Garcia was charged was similar to a series of robberies committed by E.M.F. members in the area during the few months before the charged robbery, and that such robberies were a primary activity of the E.M.F. gang. *Id.* at 1102. Although Bojorquez had identified Garcia to the police the day after the robbery, he testified at trial that he did not remember what the gang members said and further testified that Garcia was not one of the people who accosted him. *Id.* at 1101. The gang expert testified that it was common for victims of gang-related crimes to back-track on statements they initially made to police because of the "fear intimidation process." *Id.* at 1102.

The state court jury found Garcia guilty of the robbery of Bojorquez, and found true the gang enhancement pursuant to section 186.22(b)(1), and the gun use enhancement pursuant to sections 12022.53(d) and (e)(1). *Garcia*, 395 F.3d at 1102. In a 2-1 decision, the California Court of Appeal affirmed Garcia's conviction and the 21-year sentence imposed, including 5 years for a prior serious felony. *Id.* (citing § 667(a)(1)). The Court of Appeal rejected Garcia's claim of insufficiency of the evidence of the "specific intent" required for the gang and gun use enhancements, because the evidence supported a rational inference that the robbery of Bojorquez was not "a random street robbery," but one in a series of robberies com-

mitted in the Little Five Points Area "not only to obtain the property of the victims, but also as a means of instilling fear of the gang in the residents of the neighborhood, and thereby facilitating the gang's criminal operations in the area." *Id.* at 1103.[9] As the dissenting judge in *Garcia* noted, the California Court of Appeal further observed that the "[r]esidents intimidated in this fashion are less likely to report crime," and that "nefarious control of the Little Five Points Area and its residents qualifies, in our view, as criminal conduct by gang members within the meaning of [section 186.22(b)(1)]." *Id.* at 1105 (Wallace, J., dissenting). The California Supreme Court denied Garcia's petition for review. *Id.* at 1102.

Upon the government's appeal to the Ninth Circuit from a district court order granting Garcia's federal habeas petition, the *Garcia* majority rejected the conclusion of the California Court of Appeal, agreeing with the district court that the prosecution was required to present evidence of some *other* specific criminal activity that was furthered by the crime of conviction to satisfy the "specific intent" element in section 186.22(b)(1):

> There is nothing in this record . . . that would support an inference that Garcia robbed Bojorquez *with the specific intent to facilitate other criminal conduct* by the E.M.F. The evidence indicates that Garcia was a gang member and that he robbed Bojorquez in an area known to be in the heart of the gang's "turf." Detective Hernandez, the gang expert, testified that the gang was "turf oriented," and he described three other robberies committed by E.M.F. members in El Monte during the few months prior to Garcia's

[9]The unpublished decision of the California Court of Appeal, Second Appellate District, Division Three, in *People v. Garcia,* Cal. Ct. App. No. B126441 (Jan. 13, 2000), is not available on-line. However, key rulings of the Court of Appeal are quoted at length by the majority and the dissent in *Garcia. See* 395 F.3d at 1103; *id.* at 1105-06 (Wallace, J., dissenting).

offense. But there is no evidence indicating that this robbery was committed *with the specific purpose of furthering other gang criminal activity,* and there is nothing inherent in the robbery that would indicate that it furthers some other crime. There is nothing on the record that connects the "turf-oriented" nature of the gang with the commission of robberies generally, or, more importantly, with the commission of this robbery in particular. The expert's testimony is singularly silent on what criminal activity of the gang was furthered or intended to be furthered by the robbery of Bojorquez.

395 F.3d at 1103 (emphasis added).[10] Specifically with respect to the Court of Appeal's conclusion that the jury could reasonably infer the robbery by Garcia and his accomplices was similar to the string of robberies about which the gang expert had testified in detail, and which constituted "one of the primary activities" of the E.M.F. gang, the *Garcia* majority declared that:

There was testimony that the gang committed robberies, but there was nothing to indicate why those robberies were aided or intended to be aided by this robbery. Because there was *no* testimony or other evidence to support a rational inference that the rob-

---

[10]Although the *Garcia* majority did not cite them, the California cases on which the district court relied in requiring proof of "other criminal conduct" apart from the offense of conviction, were *People v. Beeman*, 35 Cal.3d 547, 560 (1984), and *People v. Green*, 227 Cal.App.3d 692, 703-04 (1991). The district court cited *Beeman,* which is a leading case defining "aider and abettor" liability, for the proposition that the "specific intent" element of section 186.22(b)(1) "includes the intent to do some act or achieve some consequence beyond the *actus reus* of the crime." The district court did not notice, however, that *Green* was interpreting section 186.22(a), which defines the substantive offense of "active participation" in a criminal street gang, *not* the sentencing enhancement provisions in section 186.22(b), which presuppose the commission of a specific substantive offense.

> bery of Bojorquez was committed with the intent to further other criminal activity of E.M.F., the ruling of the California Court of Appeal meets the deferential AEDPA standard for federal habeas corpus relief: the ruling is "an unreasonable application of [ ] clearly established Federal law, as determined by the Supreme Court of the United States

*Id.* at 1103-04 (quoting 28 U.S.C. § 2254(d)(1); emphasis in original).

In reaching this conclusion, the *Garcia* majority attempted to distinguish the only California Supreme Court case that has touched upon the "specific intent" element in section 186.22(b)(1), albeit only in passing. 395 F.3d at 1104 (citing *Gardeley*, 14 Cal.4th 605, 619 (1997)). In *Gardeley*, the Court found the "specific intent" element established by the testimony of a gang expert about how the assault in that case, committed on the "turf" of the criminal street gang of which the co-defendants were members, in full view of residents in the area, "was a 'classic' example of gang-related activity" in that "criminal street gangs rely on such violent assaults to frighten the residents of an area where the gang members sell drugs, thereby securing the gang's drug-dealing stronghold." 14 Cal.4th at 619. The *Garcia* majority held that the expert testimony in *Gardeley* was sufficient to permit the jury reasonably to conclude that the attack was committed with the necessary specific intent to further *other* criminal activity of the defendants' gang, but did not otherwise explain why it believed "[n]o comparable testimony was presented in Garcia's case." 395 F.3d at 1104.

Finally, the *Garcia* majority cited examples of California cases in which it believed there *was* sufficient evidence of "other criminal gang activity" furthered by the crime of conviction. *Id.* (citing *People v. Augborne*, 104 Cal.App.4th 362, 372-73 (2002) (expert testified that explicitly gang-related criminal threats made in support of a fellow gang member

were committed for the promotion and assistance of criminal conduct by gang members);[11] *In re Ramon T.*, 57 Cal.App.4th 201, 207-08 (1997) (assault on peace officer who had another gang member in custody was committed in order to assist the gang member's escape); *People v. Ortiz*, 57 Cal.App.4th 480, 484-85 (1997) (robbery and murder committed with the specific intent of framing a rival gang for the crimes).

**B.**

In *Briceno,* 555 F.3d 1069, our court recently held—again in a 2-1 decision—that *Garcia* was correctly decided, notwithstanding the fact that its interpretation of California's gang enhancement statute has been repeatedly rejected by numerous California state courts. *Id.* at 1080-83 (declining to follow *Hill*, 142 Cal.App.4th 770, and *Romero*, 140 Cal.App.4th 15); *id.* at 1081 n.4 (concluding that *Morales*, 112 Cal.App.4th 1176, is not an accurate statement of California law).

The defendant in *Briceno* was convicted of a string of four armed robberies committed with a fellow gang member during a "grinchly crime wave" between 1:00 a.m. and 3:30 a.m. on Christmas day in 2000 in Anaheim and Garden Grove, California. 555 F.3d at 1072. Briceno and his accomplice, Landin, were both members of the Hard Times Street Gang,

---

[11]It is not clear that the defendant's "specific intent" under section 186.22(b)(1) was even at issue in *Augborne*. *See* 104 Cal.App.4th at 370, 373 (defendant challenged only findings of two or more "predicate offenses" required to establish a "pattern of criminal gang activity" under section 186.22(e) and his membership in a "criminal street gang" within the meaning of section 186.22(f), claiming there was insufficient evidence that the persons who committed prior crimes were gang members at the time or that the predicate crimes were committed "for the benefit" of the gang). There was also no indication that the gang expert explained how the criminal threats made by the defendant would "promote, further or assist" criminal gang conduct apart from the offenses of conviction. *See* 104 Cal.App.4th at 369-70, 372-73.

which was stipulated to be a "criminal street gang" within the meaning of section 186.22. *Id*. at 1072-73.

At the joint trial of Briceno and Landin, the prosecution presented the testimony of a gang expert, Peter Vi, who had been assigned to patrol the three block area of Garden Grove controlled by the Hard Times gang. *Id*. at 1073-74. Vi testified in general about gang culture, including the central role of "respect" as a source of power for gang members, and how gang members use violence to increase the respect they and their gang are given, to raise their individual status within the gang, and to increase their recruitment of new gang members. *Id.* at 1074. When given a hypothetical incorporating the facts of the case, and asked whether he believed the four robberies were "committed for the benefit of, at the direction of, or in association with the criminal street gang Hard Times, and with intent to promote, further and assist criminal conduct by members of the Hard Times gang," Vi did not directly answer, but said he thought the co-defendants' actions were intended to "glorify" the gang, and that the crimes would raise their status in the gang and give them increased opportunities to participate in further crimes that other Hard Timers would be more likely to solicit them to commit. *Id.* When asked if his opinion would be any different if he knew that the robberies were committed to get money with which to buy Christmas presents (as Landin told one of the police detectives) and that they yielded only a relatively small amount of money, Vi said those facts would be of no moment; the defendants' conduct would nonetheless glorify the gang and their status would be enhanced within the gang. *Id.*

Briceno and Landin were both convicted of four counts of second degree robbery and four counts of street terrorism, and the jury found true the section 186.22(b)(1) gang enhancements alleged as to each robbery count. *Id.* at 1075. Because he had two prior convictions of serious or violent felonies, and had served a prior prison term, Briceno was sentenced under California Three Strikes law to an indeterminate sen-

tence of 27 years to life, and a determinate sentence of 23 years and 4 months, including the gang enhancements for the robberies. *Id*.

On direct appeal, the California Court of Appeal rejected Briceno's argument that the evidence was insufficient to support a finding that the crimes were committed "for the benefit of a criminal street gang" within the meaning of the gang enhancement statute. *See People v. Briceno,* No. G029525, 2003 WL 1710927 (Cal. Ct. App. Mar. 28, 2003). The California Court of Appeal explained:

> Defendants note there was evidence to show the crimes were committed for personal gain (money to buy Christmas gifts) rather than any gang-related purpose. The problem with this argument is that it ignores Vi's expert testimony explaining how the commission of these crimes would enhance the reputation not only of the gang itself but of the individual participants as well. Based on this evidence, the jurors could reasonably have found the gang enhancement allegations were true. It was for the jurors to resolve any credibility issues or conflicts in the evidence. We cannot second-guess their decision on appeal.

*Id*. at *3 (quoted in *Briceno*, 555 F.3d at 1075). The California Supreme Court denied Briceno's petition for review, but granted the government's petition for review on an unrelated sentencing issue, as to which it subsequently reversed the judgment of the Court of Appeal, but affirmed in all other respects. *See People v. Briceno*, 34 Cal.4th 451, 456 (2004).

In the habeas proceedings before this court, Briceno relied on *Garcia* to argue that the evidence at trial was insufficient to support the finding that he committed the robberies with the "specific intent to promote, further or assist in any criminal conduct by gang members" within the meaning of section

186.22(b)(1). The *Briceno* majority agreed, and rejected the holding of the California Court of Appeal on the gang enhancement issue. 555 F.3d at 1078-83. First, the *Briceno* majority observed that the gang expert testified only in "generalities" about how the robberies would "glorify" the defendant's gang and "sa[id] nothing about Briceno's *specific intent* in committing the robberies." 555 F.3d at 1078-79 (emphasis in original). In addition, the *Briceno* majority held that the record was "singularly silent" as to what *other* criminal activity of the gang, apart from the offenses of conviction, was intended to be furthered or facilitated by the robberies, as required by *Garcia. Id.* at 1079 & n.3 (emphasis added). Finally, the *Briceno* majority concluded the "specific intent to . . . assist in any criminal conduct by gang members" was not established because "the mere fact that Briceno committed the robberies with another gang member is insufficient to support a gang enhancement under section 186.22(b)." 555 F.3d at 1083; *id.* at 1081 n.4 (distinguishing *Morales*).[12]

The *Briceno* majority acknowledged that, in the absence of a pronouncement by the state's highest court on an issue of state law, the federal courts are bound to follow the decisions of the intermediate state appellate courts unless there is "convincing evidence" that the state's highest court would reach a different conclusion. 555 F.3d at 1080 (citing *Owen ex rel. Owen v. United States*, 713 F.2d 1461, 1464 (9th Cir. 1983), and *In re Watts*, 298 F.3d 1077, 1082-83 (9th Cir. 2002)). Nevertheless, it rejected the government's suggestion that *Garcia* is no longer good law since the California Courts of Appeal in *Romero* and *Hill* held that this court misinterpreted section 186.22(b)(1) in that case. 555 F.3d at 1079-80. The *Briceno* majority also declined to follow several pre- and

---

[12]While it said so only in a footnote, the *Briceno* majority found that the "only evidence" presented to the jury as to Briceno's specific intent indicated that he and Landin committed the robberies "on a frolic and detour unrelated to the gang," namely, to obtain money to buy Christmas presents. 555 F.3d at 1081 n.4.

post-*Garcia* decisions from the California Courts of Appeal which have held that, under the plain language of section 186.22(b)(1), a specific intent to *assist* a known gang member in committing the crime of conviction *is* sufficient to satisfy the "specific intent" element. *Villalobos*, 145 Cal.App.4th at 322 (evidence that non-gang member defendant committed robbery and burglary in concert with her boyfriend, a known gang member, was substantial evidence that she acted with the specific intent required for gang enhancement); *Romero*, 140 Cal.App.4th at 19-20 (evidence that the defendant drove a fellow gang member into a rival gang's territory to carry out a drive-by shooting was sufficient to establish defendant's specific intent for gang enhancement, as it was fairly inferable that he intended to assist his fellow gang member in committing the murder); *Morales,* 112 Cal.App.4th at 1198 (evidence that defendant intended to commit robberies in association with two fellow gang members was sufficient to prove he intended to aid and abet the robberies and specifically intended to assist in that criminal conduct by fellow gang members within meaning of gang enhancement statute); *see also Vazquez*, 178 Cal.App.4th at 353-55 (evidence that the defendant and two fellow gang members killed a man they suspected of being a member of a rival gang, and that defendant was assisted by other gang members and associates as he attempted to evade arrest, was sufficient to establish specific intent to "promote" criminal activity of his gang).

The *Briceno* majority explained its refusal to follow this substantial body of authority from the California Courts of Appeal by saying that the *Garcia* panel had examined *Gardeley*, 14 Cal.4th 605, to find "the type of evidence necessary to sustain a gang enhancement" under section 186.22(b)(1), 555 F.3d at 1080-81, and that under the "authoritative interpretation" provided by the California Supreme Court in that case, "merely being a gang member or committing a crime in association with another gang member" cannot satisfy the "specific intent" element of the California gang enhancement statute. 555 F.3d at 1080 (citing *Gardeley*, 14 Cal.4th at 624

n.10).**[13]** Rather, some "circumstantial evidence" of specific intent to aid or abet the criminal conduct of the gang or otherwise to benefit the gang—e.g., evidence that the defendant committed the crime to protect gang "turf" or brandished gang signs or used a gang moniker—is required. 555 F.3d at 1080-81.**[14]**

Thus, the *Briceno* majority concluded that *Gardeley* suggests the California Supreme Court "would not adopt the State's understanding of *Romero* and *Hill*," 555 F.3d at 1080, and would not hold that there was sufficient evidence that Briceno committed the four Christmas day robberies—which were not committed in Hard Times gang territory or on the "turf" of a rival gang, and in which neither Briceno nor Landin flashed gang signs or tattoos or used gang monikers— with the "specific intent to promote, further, or assist in any criminal conduct by gang members" as required by section 186.22(b)(1). 555 F.3d at 1081-82.

## C.

As the foregoing demonstrates, there is sharp divergence of opinion between this court and the California Courts of

---

**[13]**On this point, the *Briceno* majority believed *Gardeley* made clear that the California gang statute "increased punishment only when a defendant 'committed a felony to aid or abet criminal conduct *of a group* that has as a primary function the commission of specified criminal acts and whose members have actually committed specified crimes, and who acted with the specific intent to do so.' " 555 F.3d at 1080 (quoting *Gardeley*, 14 Cal.4th at n.10) (emphasis added in *Briceno*). When read in the context, however, the statement more accurately appears to reflect only the *Gardeley* Court's view that section 186.22 does not punish a defendant for other gang members' unrelated criminal actions. *See Gardeley*, 14 Cal.4th at 624 n.10.

**[14]**The *Briceno* majority did not explain why the use of a gang moniker during the robbery in *Garcia* by members of a "turf-oriented" gang, in the "heart of their turf," as but one of a series of similar robberies in the same area, *see* 395 F.3d at 1103, did not qualify as "circumstantial evidence" of an intent to benefit the gang.

Appeal regarding the proper interpretation of the "specific intent" element that must be proven beyond a reasonable doubt before a criminal street gang enhancement may be imposed pursuant to section 186.22(b)(1). The main point of disagreement is whether an *offense of conviction* qualifies as "any criminal conduct by gang members" that the defendant must have specifically intended to "promote, further, or assist," or whether proof of some "other" criminal conduct, apart from the offense of conviction, is required. A second, but equally important matter of dispute is whether evidence that the defendant acted *in concert with* another gang member, with the specific intent to "assist" him or her in committing the crime of conviction, will satisfy the "specific intent" element in section 186.22(b)(1). A further point of disagreement is about the quantum and quality of proof a "gang expert" may provide to satisfy the "specific intent" requirement under section 186.22(b)(1).

The conflict between the state and federal courts on these issues will likely increase as the many dozens of pending California criminal cases with gang enhancements wend their way through the direct appeal and collateral review processes, and may not be resolved until the California Supreme Court sees its way clear to take up the issue. As the gulf between these two bodies of law widens, moreover, the tension between California state law as declared by the California Courts of Appeal, and the federal courts' "best guess" as to the circumstances under which the California Supreme Court would uphold or strike down gang enhancements, will only grow.

We realize that our request is a bit unusual. Indeed, we have not found any other published order or decision in which a federal court of appeals has asked the California Supreme Court to interpret a provision of the California Penal Code, or any decision in which California's high court agreed to interpret a state criminal statute at the behest of a federal court—much less any request for an authoritative interpretation of a

California criminal statute to be applied in federal habeas corpus proceedings. But we see nothing in the California Rules of Court that precludes our request, and we believe principles of comity will be best served by our making this request now, rather than allowing the conflict over these important questions of state law to fester.

On questions of state law we take very seriously our obligation to "follow the decision of the intermediate appellate courts of the state unless there is convincing evidence that the highest court of the state would decide differently." *Owen*, 713 F.2d at 1464. But where, as here, there are conflicting views within our own court as to whether the California Supreme Court would reject the nearly unanimous decisions of the California Courts of Appeal on these issues, *see Briceno*, 555 F.3d at 1080-82, *cf. id.* at 1086-90 (Wardlaw, J., dissenting), we believe the California Supreme Court should have the opportunity to speak for itself. We would be grateful if the Court would take that opportunity here, and grant our request to answer the certified questions.

## V.   Stay and Withdrawal from Submission

All further proceedings in this case are stayed pending final action by the California Supreme Court. This case is withdrawn from submission until further order of this court. This panel retains jurisdiction over any further proceedings in this case upon receipt of a decision from the California Supreme Court answering the certified question or a decision declining to answer the certified question.

The parties shall notify the clerk of this court within ten (10) days after the California Supreme Court accepts or rejects certification. If the California Supreme Court accepts the certified question or questions, the parties shall file a joint status report in this court every sixty days after the date of acceptance, or more frequently if circumstances warrant, and

again within ten days if the California Supreme Court renders an opinion.

In accordance with rule 8.548 of the California Rules of Court, the clerk of this court is hereby directed to transmit forthwith to the California Supreme Court, under official seal of the Ninth Circuit, the original and ten copies of this order, along with all relevant briefs and excerpts of record. The clerk shall also file a certificate of service on the parties to this appeal. Cal. R. Ct. 8.548(c)-(d).

It is so ORDERED.