Filed 11/21/13  P. v. O'Sullivan CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER O'SULLIVAN,<br><br>Defendant and Appellant. | B240326<br><br>(Los Angeles County<br>Super. Ct. No. LA064540)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on October 31, 2013, be modified in the following manner:

In the second full paragraph on page 8, a "footnote 3" is inserted at line 6 of that paragraph, after the words "conduct in this specific instance."  The inserted footnote 3 shall read:

O'Sullivan's testimony that he was carrying the shotgun for his own protection does not support the gang enhancement.  Furthermore, there was no evidence that anyone at the scene knew that O'Sullivan was a gang member so there was no reason why his possession of the gun would create fear of his gang among members of other gangs or the public.

Accordingly, footnote 3, appearing on page 10 of the opinion, is now footnote 4.

This modification does not constitute a change in the judgment.

The petition for rehearing is denied.

<u>NOT TO BE PUBLISHED</u>.


MALLANO, P. J.                    ROTHSCHILD, J.                    CHANEY, J.

2

Filed 10/31/13 (unmodified version)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B240326 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA064540) |
| v. | |
| CHRISTOPHER O'SULLIVAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Thomas Rubinson, Judge. Affirmed in part; reversed in part.

Melanie K. Dorian, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Blthe J. Leszkay and Toni R. Johns Estaville, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted 19-year-old Christopher O'Sullivan of two counts of assault with a firearm on a police officer, one count of possession of a short-barreled shotgun and found that he committed the crimes for the benefit of a criminal street gang. The court sentenced O'Sullivan to 34 years 8 months in prison. On appeal, O'Sullivan contends that the evidence was insufficient to convict him of assault on the officers and insufficient to support the gang enhancements. At the very least, he argues, punishment for one of the assault counts should be stayed under Penal Code section 654. We reverse the gang enhancements for insufficiency of the evidence. In all other respects we affirm the judgment.

## FACTS AND PROCEEDINGS BELOW

### A.     The Alleged Assault

On an evening in March 2010, at approximately 10:45 p.m., Los Angeles police officers Jacob Palacios and Jorge Hernandez were on patrol in the vicinity of Tujunga Boulevard and California Avenue in North Hollywood (a gang territory claimed by the North Hollywood Boys). The officers observed a white Cadillac with three occupants speeding on Tujunga. Palacios activated his lights and siren and gave chase.

The driver of the speeding car eventually stopped at a fast-food restaurant near Lankershim Boulevard and O'Sullivan emerged from the rear passenger seat bearing a sawed-off shotgun. He held the gun at mid-waist level with one hand toward the muzzle and his other hand in the trigger area. He was not pointing or directing the gun at the officers. When he noticed the officers, he raised the gun with both hands to his mid-chest level and pointed it at a 45-degree angle toward the ground.

O'Sullivan began running toward the restaurant's children's play area, Palacios and Hernandez followed in their car and the Cadillac sped off down Lankershim.

O'Sullivan ran into a shopping center parking lot still holding the shotgun. When the officers lost sight of O'Sullivan, they stopped their car and got out. O'Sullivan came into their view as he walked between two cars gripping the gun in both hands. He looked

in the officers' direction from approximately 50 to 70 feet away, and pointed the gun at them. Neither the officers nor O'Sullivan said anything.

When the officers saw O'Sullivan point the shotgun at them, they drew their own weapons and took cover behind their car. O'Sullivan ran behind a car in the parking lot and disappeared from the officers' sight. Officer Palacios heard "a loud bang" and thought he was being shot at. Bystanders pointed in the direction O'Sullivan had gone and the officers followed. Along the way they found a loaded shotgun lying on the ground. Looking toward Lankershim, Officer Palacios saw O'Sullivan running toward a motel and notified dispatch of O'Sullivan's location. A short time later, other police officers responded to the area of the motel. An officer and his canine, Rex-the-Wonder-Dog, found O'Sullivan hiding under a van behind the motel.

### B.    The Alleged Gang Enhancement

While Officers Palacios and Hernandez and their colleagues were searching for O'Sullivan other officers found the white Cadillac parked on Victory Boulevard. On the driver's seat the officers found a license in the name of Dylan Valencia a member of the North Hollywood Locos gang. On the night of the incident Valencia and another member of the Locos were seen walking together near the fast-food restaurant where O'Sullivan had exited the Cadillac.

Officer Enrique Guerrero testified as the prosecution's gang expert.

According to Officer Guerrero, four gangs occupied or claimed territory in the area where the O'Sullivan incident occurred: the North Hollywood Locos, the North Hollywood Boys, their ally, Clanton, and the 18th Street gang. O'Sullivan and Valencia belonged to the Locos, who were enemies of the Boys and Clanton gangs. Unlawful possession of firearms was one of the primary criminal activities of the Locos. The Locos believed that Clanton was responsible for the murder a few months earlier of "Downer," a Locos member. "Downer" was a friend of O'Sullivan's who had been with him at the time of the killing. Since then there had been increasing violence between the Locos and the Boys and Clanton.

3

Guerrero knew from O'Sullivan's own admission that he was a member of the Locos and that his moniker was Lil Spider. In addition, O'Sullivan had visible tattoos identifying him as a member of the Locos and on the night of the incident was wearing a St. Louis Cardinals hat. The Locos used Cardinals apparel to represent their gang.

According to Guerrero, the intersection of Tujunga and California, where officers Palacios and Hernandez first saw the white Cadillac, is in the territory claimed by the Boys. Guerrero concluded from the evidence that Valencia had been driving the Cadillac and O'Sullivan and the other Locos member had been passengers. In Guerrero's opinion there was "only one reason" why three Locos with a loaded shotgun would enter the Boys' territory shortly after the murder of a fellow Loco and that was to retaliate for the murder of "Downer."

Guerrero further testified that in his opinion O'Sullivan's pointing the shotgun at the officers benefited the gang by giving its members a reputation as "cop killers." That reputation impresses other gangsters and intimidates non-gang members. Running away from the police also assisted the gang because the gang would benefit if O'Sullivan was not arrested.

Finally, Guerrero testified that in his opinion the three Locos were not armed solely for their own protection because they had to go through rival gang territory to get to a Taco Bell, as O'Sullivan testified. If that was the case, Guerrero explained, the Locos would not have driven through minor streets when they could have taken a major street such as Lankershim.

There was evidence showing that O'Sullivan had obtained new tattoos while in jail awaiting trial. Guerrero testified that other inmates may have heard O'Sullivan broadcast the facts of his offense and given him the tattoos as a sign of respect.

4

## C. The Verdict, Sentence And Appeal

The jury found O'Sullivan guilty of two counts of assault with a firearm on a police officer, one count of unlawful possession of a short barreled shotgun and found true the firearm and gang enhancement allegations.

The court sentenced O'Sullivan to a total prison sentence of 34 years 8 months.

## DISCUSSION

## I. THE ASSAULT CONVICTIONS ARE SUPPORTED BY SUBSTANTIAL EVIDENCE.

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. '"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.]"'" (*People v. Smith* (2005) 37 Cal.4th 733, 738-739.)

Penal Code section 240 defines an assault as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." In other words, assault requires the intent to attempt to commit a battery. (*People v Chance* (2008) 44 Cal.4th 1164, 1167.) O'Sullivan's appeal goes to the question of the quantum of evidence necessary to satisfy the intent element of assault with a firearm. He argues that simply pointing a loaded gun at the victim is insufficient evidence of intent to commit a violent injury. We disagree.

In *People v. McMakin* (1857) 8 Cal. 547, 548 our high court addressed the question "what shall constitute evidence of . . . intention" to commit a violent injury with a firearm. In that case, Green was riding his horse through land claimed by the defendant when he was intercepted by the defendant who threatened to shoot Green if he did not leave the land. At the same time the defendant made this threat, he drew a gun "which he held in a perpendicular line with the body of Green, but with the instrument so pointed that the ball would strike the ground before it reached [Green], had the pistol been

5

discharged." (*Id*. at p. 547.) The court upheld the defendant's conviction of assault with a deadly weapon. On the issue of proof of the defendant's intent, the court observed that "[t]he drawing of a weapon is generally evidence of an intention to use it." (*Id*. at p. 549.) The court explained that "directly" pointing a firearm at the victim is sufficient evidence of an intent to commit a violent injury. (*Ibid.*, emphasis omitted.)

Here, O'Sullivan emerged from his hiding place among the cars in the parking lot and immediately pointed his shotgun at the officers. He was so convincing that they feared for their lives and retreated. The jury was fully warranted in finding that O'Sullivan intended to inflict a violent injury on the officers.

## II. THE GANG ENHANCEMENTS ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

For the gang enhancements to apply the People had to prove that the underlying crimes were committed "for the benefit of, at the direction of, or in association with any criminal street gang" *and* "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (Pen. Code, § 186.22, subd. (b)(1).)[1] O'Sullivan contends that neither prong is supported by substantial evidence. We agree.

There was no evidence that when O'Sullivan pointed the shotgun at the officers he was acting at the direction of, or in association with, the other Locos in the Cadillac. In fact, as soon as O'Sullivan got out with the shotgun the car containing the other Locos sped off. The People's only theory as to the nexus between O'Sullivan's conduct and a benefit to the gang is the element of intimidation described by Officer Guerrero.[2]

The gang enhancement to each count was based entirely on Officer Guerrero's opinion that O'Sullivan's pointing the shotgun at the officers both benefited and promoted the Locos by giving them a reputation as "cop killers" which increases their

---

[1] All statutory references are to the Penal Code.

[2] The People speculate that O'Sullivan's conduct might have benefited the gang by slowing down the police and giving his fellow gang members in the Cadillac a chance to get away. Guerrero, the gang expert, did not testify to this potential benefit so it remains speculation, not a ground for upholding the enhancements.

6

respect among other gangs and facilitates their criminal activities by instilling fear and intimidation in the public. (Cf. *People v. Livingston* (2012) 53 Cal.4th 1145, 1172; *People v. Vazquez* (2009) 178 Cal.App.4th 347, 353 [evidence of acts of violence can support findings of benefit and promotion].) There are two problems with this theory.

There was no evidence that any gang members witnessed or learned about O'Sullivan's assault on the officers. (As previously noted the evidence showed that the other gang members in the Cadillac were not present when O'Sullivan pointed his shotgun at the officers.) Guerrero conjectured that other jailed gang members may have learned why O'Sullivan was there and given him the tattoo as a sign of respect. He admitted, however, that this "doesn't always happen" and that he had "no idea" how things worked in jail: "I'm the gang expert," he testified, "I'm not the prison expert."

Although there may have been bystanders who saw O'Sullivan point his gun at the officers, there is no evidence that any of these bystanders knew that O'Sullivan was a member of the Locos. He did not throw any gang signs, shout gang slogans or call out the gang's name. He did wear a St. Louis Cardinals hat but there is no evidence that anyone on the scene either noticed that he was wearing the hat, connected the hat with the Locos, nor is wearing a St. Louis Cardinals hat obviously related to the Locos. The team, no doubt, has thousands of fans in the Los Angeles area.

There was evidence that O'Sullivan had numerous tattoos including gang tattoos that were visible in the courtroom but there was no evidence that those tattoos were visible in the shopping center parking lot at 11:00 at night. Nor was there any evidence that bystanders who witnessed the incident and saw the tattoos would have known the tattoos represented the Locos. Guerrero conceded that the witnesses might not have known O'Sullivan's gang affiliation from his tattoos but observed: "[E]verybody in the shopping mall I'm pretty sure is aware if they see a young man running with a shotgun dressed a certain way in tattoos, they're going to have a first assumption that that's a gang member." Be that as it may, the gang enhancement statute has traditionally been understood to apply to the defendant's benefiting and promoting a particular gang and

7

gang members, not gangs and gang members in general. (See § 186.22, subd. (f); *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1199 [expert's opinion about gangs in general insufficient to sustain gang enhancement].)

Furthermore, just because the person who perpetrates a crime happens to be a gang member does not establish that the crime itself was committed with the specific intent to promote the gang or further its objectives. (See *People v. Gardeley* (1996) 14 Cal.4th 605, 623-624; *People v. Albarran* (2007) 149 Cal.App.4th 214, 221, 227; *In re Frank S.*, *supra*, 141 Cal.App.4th at pp. 1196, 1199 [section 186.22(b)(1) "does not criminalize mere gang membership" without proof of the predicates for the enhancement; membership in a gang alone does not prove a specific intent to promote criminal conduct by gang members; gang members can and do commit crimes for personal reasons]; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198.)

Turning to the second gang enhancement requirement, the evidence of specific intent to further the activities of the gang was once again limited to Guerrero's testimony that conduct by gang members that intimidates other gangs and the community can further the objectives of the gang. We accept this premise. But, as noted above, the prosecution failed to show that anyone could have been intimidated by O'Sullivan's conduct in this specific instance. Nor was there evidence of any of the other common indicia of intent to further gang objectives such as participation by multiple gang members (*People v. Morales*, *supra*, 112 Cal.App.4th at pp. 1197-1198 [actions directed at rival gang members]; *People v. Gardeley*, *supra*, 14 Cal.4th at p. 622; *People v. Romero* (2006) 140 Cal.App.4th 15, 17-18 [the suspicion by the perpetrator that the victims are rival gang members]; *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1190 [the public or repeated flashing of gang signs to strangers]; see, e.g., *People v. Margarejo* (2008) 162 Cal.App.4th 102, 105-106 [a concern with protecting gang territory from intruders, whether gang affiliated or not]; *People v. Gardeley*, *supra*, 14 Cal.4th at pp. 615, 619 [or evidence of planning or approval by other gang members (see, e.g., *People v. Ferraez* (2003) 112 Cal.App.4th 925, 931). Nor was there any contention that

the officers had "disrespected" any gang member, subjecting themselves to an etiquette lesson in the treatment of gangs. (*People v. Hill* (2006) 142 Cal.App.4th 770, 772.) Guerrero testified the "only reason" O'Sullivan and the other Locos were in rival gang territory with a loaded shotgun was to retaliate for the murder of "Downer." But that motive had no relationship to the crime that he committed—assault on a police officer.

Although we agree that the above is not an exclusive list of indicia of specific intent, still the totality of the circumstances must present evidence of intent sufficient to allow a reasonable juror to find the elements of the enhancements beyond a reasonable doubt. Reduced to its basics, the evidence here is limited to conduct by a person who happened to be a gang member who acted alone to try to intimidate two Los Angeles police officers.

### III. O'SULLIVAN IS NOT ENTITLED TO A STAY OF THE PUNISHMENT ON ONE OF THE COUNTS OF ASSAULT WITH A FIREARM.

O'Sullivan contends the court should have stayed punishment on one of the two counts of assault with a firearm under section 654. We disagree.

Section 654, subdivision (a) states in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Taken literally, section 654 does not apply to the case before us because under its plain language it only applies when an act or omission is punishable in "*different ways*" by "*different provisions of law*." Here, O'Sullivan is being punished twice under the *same provision of law*: section 245, subdivision (d)(1), assault with a firearm on a peace officer.

Until recently, however, section 654 was not taken literally but given a "gloss" by a footnote dropped by our high court in *Neal v. State of California* (1960) 55 Cal.2d 11, 18, fn.1 (*Neal*). In that footnote the court stated: "Although section 654 does not expressly preclude double punishment when an act gives rise to more than one violation of the same Penal Code section" (as in O'Sullivan's case), "it is settled that the basic

principle it enunciates precludes double punishment in such cases also." (*Ibid.*; citations omitted.)[3] Thus, under the gloss of footnote 1, it would appear that O'Sullivan is correct in urging that he can only be punished for one of the two assault convictions.

Having recognized a gloss on the words of the statute in footnote 1, the *Neal* court proceeded to recognize an exception to the gloss. In what would become known as the "multiple victim" exception, the court held that Neal was properly punished for each of two convictions of attempted murder committed at the same time by the same act. (*Neal*, *supra*, 55 Cal.2d at pp. 15, 20-21.) The court explained: "The two attempted murder convictions, however, present a different problem. The purpose of the protection against multiple punishment is to insure that the defendant's punishment will be commensurate with his criminal liability. A defendant who commits an act of violence with the intent to harm more than one person or by a means likely to cause harm to several persons is more culpable than a defendant who harms only one person. For example, a defendant who chooses a means of murder that places a planeload of passengers in danger, or results in injury to many persons, is properly subject to greater punishment than a defendant who chooses a means that harms only a single person. This distinction between an act of violence against the person that violates more than one statute and such an act that harms more than one person is well settled. Section 654 is not ". . . applicable where . . . one act has two results each of which is an act of violence against the person of a separate individual." (*Id.* at pp. 20-21, citing *People v. Brannon* (1924) 70 Cal.App. 225, 235-236.)

Thus, whether we apply the literal wording of section 654 or the "multiple victim" exception, the trial court's decision not to stay the sentence on the second assault conviction was correct. (*People v. Hall* (2000) 83 Cal.App.4th 1084, 1086-1087,

---

[3]     Subsequent to O'Sullivan's conviction the court disapproved the gloss in footnote 1 of *Neal*. The disapproval was prospective only so it does not apply to O'Sullivan's appeal. (*People v. Correa* (2012) 54 Cal.4th 331, 334, 344.)

*People v. Prater* (1977) 71 Cal.App.3d 695, 699 [punishment permitted on each count of assault with a firearm under the "multiple victim" exception].)

O'Sullivan asks us to ignore the "multiple victim" exception on the grounds *Neal v. State of California* was wrongly decided on that issue and the continuing validity of the exception has been undercut by recent Supreme Court decisions in *People v. Jones* (2012) 54 Cal.4th 350 and *People v. Mesa* (2012) 54 Cal.4th 191. We decline O'Sullivan's invitation for two reasons. Our Supreme Court has not disapproved the "multiple victim" exception (although it would seem to have little relevance after *People v. Correa*, *supra*, 54 Cal.4th 331 (see discussion at fn. 3, *ante*)) thus we are bound to follow it under *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450. In any event, if we ignored the "multiple victim" exception we would not default to the gloss of footnote 1 in *Neal*, which has been disapproved by our high court, but to the literal language of section 654 which, as we have explained, would permit punishment for both counts of assault in this case. (See discussion at p. 9, *ante*.)

## DISPOSITION

The gang enhancements are reversed and the court shall forward an amended abstract of judgment to the California Department of Corrections and Rehabilitation. In all other respects the judgment is affirmed.

NOT TO BE PUBLISHED.


ROTHSCHILD, J.

We concur:



MALLANO, P.J.



CHANEY, J.

11