[No. B213000. Second Dist., Div. Six. Oct. 13, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
GILBERT VAZQUEZ, Defendant and Appellant.

## Counsel

Susan K. Keiser, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Susan Sullivan Pithey and Julie A. Harris, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**YEGAN, J.**—Gilbert Vazquez appeals his conviction, by jury, of first degree murder in the shooting death of Juan Lopez. (Pen. Code, §§ 187, 189.)[1] The jury also found true special allegations that appellant intentionally and personally used a handgun (§ 12022.53, subds. (b)–(d)), and that he committed the murder for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)). Appellant was sentenced to a total term in state prison of 50 years to life. He contends the gang enhancement should be reversed because there is no substantial evidence that he committed the murder with "the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) He further contends the trial court erred when it conditioned the amount of a restitution fine on appellant's payment of direct victim restitution. We modify the restitution fine and, in all other respects, affirm the judgment.

### Facts

In September 2006, Juan Lopez (the victim) lived in Inglewood with his girlfriend, Griselene Flores, and their child. About 10:00 p.m. on the night of September 29, Lopez and Flores drove to a nearby fast-food restaurant while Flores's parents stayed with the child. When they returned, Lopez parked in the alley behind their apartment building. Just as they were about to leave the car, a pickup truck drove up from behind and stopped next to the passenger side door. Appellant got out of the passenger side of the truck holding a

---

[1] All statutory references are to the Penal Code unless otherwise stated.

handgun at his waist. He walked to the front of Lopez's car. Two other men stayed in the truck, telling appellant, "Get him, get him."

Flores thought the men looked like gang members. They all had shaved heads and there was a lot of gang crime in the neighborhood. She got out of the car and started pleading with appellant that Lopez was "not from nowhere." The passengers continued telling appellant to "get him." One told Flores to "shut up or we're going to get you too." She ran toward their apartment. Just as she reached the door, Flores looked back over her shoulder and saw appellant shoot Lopez the first time. Flores heard three or four more shots. By the time she got back to the car, Lopez was not breathing. He had been shot five times by appellant. Flores's mother called police from their apartment. A neighbor also witnessed the shooting from the balcony of her upper floor apartment. Her description of appellant and of the incident was consistent with Flores's.

Meanwhile, appellant got back into the truck which sped away. At some point, he got out of the truck and into a minivan with another gang member and his girlfriend. Appellant was arrested about 30 minutes later, after the driver of the minivan led Inglewood police officers on a short chase. When the minivan finally stopped, a male passenger immediately jumped out and ran away. Appellant stayed inside, hiding in the back. The murder weapon was lying nearby, on the rear floorboard. Flores identified appellant as the shooter in a field "show up" later that night.

The prosecution's expert witness on gangs, Detective Milchovich, testified that Lopez was killed in an area that is claimed as the "territory" of two rival gangs, Krazy Crowd 13 and 18th Street. There was graffiti in the alley only a few feet from the site of the shooting, in which 18th Street members had crossed out graffiti by Krazy Crowd 13, a sign of disrespect and of a willingness to fight over that territory. Appellant has tattoos on his abdomen and right arm that identify him as a member of 18th Street. His hair and clothing followed a style favored by gang members.

Detective Milchovich opined that appellant is a member of 18th Street. He based that opinion on a past contact with appellant, appellant's association with other gang members, the location of the crime, his tattoos and the fact that he did not also shoot Flores. Appellant's tattoos are significant because they are "permanent markings . . . . Tattoos signify allegiance to a gang, it's kind of your signal that you're pretty dedicated to your gang." According to Milchovich, tattoos are a "badge" signifying a gang member's "commitment to the gang."

Milchovich further explained that appellant would have earned "respect" in gang culture by shooting Lopez because Lopez might have appeared to be a member of a rival gang. However, in gang culture, "targeting women as victims of crime is . . . kind of hands off, taboo, you don't target women specifically. That brings . . . some disrespect to the gang. But to shoot at someone you believe or appears to be a rival gang member would build that respect level." The fact that appellant was with two other apparent gang members when he committed the crime and that he moved to a second vehicle only minutes after the shooting also indicated the crime was gang related.

Milchovich testified that, in his opinion, appellant committed this murder for the benefit of 18th Street. Violent crimes that create fear and intimidate others are thought, in gang culture, to increase "respect" for the gang. According to Milchovich, "A gang member who carries a gun, commits a shooting, commits a murder, proves not only his hundred percent dedication to the gang but also to promoting or furthering the gang status in the gang world as well as the reputation or respect level of that particular gang." Crimes of violence also benefit the gang because they intimidate people in the neighborhood into refusing to cooperate with police, making it easier for the gang to operate.

The trial court instructed the jury that, to find the gang enhancement allegation true, it had to find beyond reasonable doubt that, "1. The crime charged was committed for the benefit of, at the direction of, or in association with a criminal street gang; and 2. This crime was committed with the specific intent to promote, further, or assist in any criminal conduct by gang members." It further instructed the jury: "The specific intent with which an act is done may be shown by the circumstances surrounding the commission of the act. However, you may not find . . . the allegation that the defendant committed the crime for the benefit of a criminal street gang to be true, unless the proved circumstances are not only (1) consistent with the theory that the defendant had the required specific intent or mental state but (2) cannot be reconciled with any other rational conclusion." Finally, the trial court instructed the jury that, gang enhancement allegation requires "a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. Unless this specific intent exists . . . the allegation to which it relates . . . is not true."

After trial, the jury found appellant guilty of first degree murder. It found true the special allegations that appellant personally and intentionally dis-

charged a firearm (§ 12022.53, subds. (c), (d)), that he personally used a firearm (§ 12022.53, subd. (b)), and that he committed the murder for the benefit of a criminal street gang, with the specific intent to promote, further and assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)(C)). The trial court sentenced appellant to a term of 25 years to life on the murder conviction and a consecutive term of 25 years for discharging a firearm (§ 12022.53, subd. (d)), for a total term of 50 years to life. Because the trial court imposed a life sentence, appellant was not sentenced to an additional term of years for the gang enhancement. (§ 186.22, subd. (b)(5).) Instead, the gang enhancement affects appellant's parole eligibility date. He will be required to serve a minimum of 15 calendar years before being considered for parole. (*People v. Johnson* (2003) 109 Cal.App.4th 1230, 1239 [135 Cal.Rptr.2d 848].)

*Standard of Review*

Appellant contends the jury's true finding on the gang enhancement allegation is not supported by substantial evidence. As our Supreme Court recently reiterated, "On appeal, we uphold the jury's verdict if there was substantial evidence to support it. [Citation.] Considering the entire record, we determine whether there is evidence that is ' "reasonable in nature, credible, and of solid value" ' from which a ' "reasonable trier of fact could have found the prosecution sustained its burden of proving [the special allegation true] beyond a reasonable doubt." ' " (*People v. Carrington* (2009) 47 Cal.4th 145, 186–187 [97 Cal.Rptr.3d 117, 211 P.3d 617].) We view the evidence in the light most favorable to the prosecution, adopt all reasonable inferences and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*People v. Avila* (2009) 46 Cal.4th 680, 701 [94 Cal.Rptr.3d 699, 208 P.3d 634].) The standard is the same, regardless of whether the prosecution relies mainly on direct or circumstantial evidence. (*People v. Valencia* (2008) 43 Cal.4th 268, 289 [74 Cal.Rptr.3d 605, 180 P.3d 351].)

" ' "[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends." ' " (*People v. Smith* (2005) 37 Cal.4th 733, 739 [37 Cal.Rptr.3d 163, 124 P.3d 730].) It is the jury, not this court, that must be convinced beyond a reasonable doubt that the gang enhancement allegation is true. (*People v. Lewis* (2009) 46 Cal.4th 1255, 1290 [96 Cal.Rptr.3d 512, 210 P.3d 1119].) " ' "[I]f the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]" ' " (*People v. Smith, supra*, 37 Cal.4th at p. 739.)

*Discussion*

Appellant concedes that he murdered Lopez and that he did so "for the benefit of, at the direction of, or in association with," 18th Street, a criminal street gang. (§ 186.22, subd. (b)(1).) He contends, however, that the true finding on the gang enhancement allegation should be reversed because there is no substantial evidence that he committed the murder with the requisite "specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) Appellant contends there is no substantial evidence that he intended, as the statute requires, for the murder to promote other criminal activity by the gang, e.g., crimes other than the Lopez murder itself. (See, e.g., *Briceno v. Scribner* (9th Cir. 2009) 555 F.3d 1069; *Garcia v. Carey* (9th Cir. 2005) 395 F.3d 1099.) We are not persuaded. The statute refers not to "*other* criminal activity," but to "*any* criminal activity," a phrase broad enough to encompass the Lopez murder itself and the many other crimes regularly committed by 18th Street members. Moreover, the prosecution's expert witness on gang culture testified that violent crimes such as this murder increase "respect" for the gang and facilitate its criminal activities by intimidating members of rival gangs and law-abiding neighborhood residents. A reasonable jury could infer, based on this testimony and other evidence in the record, that appellant intended for the Lopez murder to have the predicted effect of intimidating rival gang members and neighborhood residents, thus facilitating future crimes committed by himself and his fellow gang members.

In *Briceno* and *Garcia* the Ninth Circuit held that the specific intent requirement of section 186.22, subdivision (b) is not satisfied by evidence of a defendant's gang membership alone, and instead requires some evidence, aside from a gang expert's "generic testimony," that supports an inference that the defendant committed the crime " 'with the specific intent to facilitate other criminal conduct by the [gang].' " (*Briceno, supra*, 555 F.3d at p. 1079, quoting *Garcia, supra*, 395 F.3d at p. 1103.) Among other things, according to the Ninth Circuit, the statute requires evidence describing " 'what criminal activity of the gang was . . . intended to be furthered' " by the crime. (*Briceno, supra*, at p. 1079, quoting *Garcia, supra*, at p. 1103.)

While our Supreme Court has not yet reached this issue, numerous California Courts of Appeal have rejected the Ninth Circuit's reasoning. As our colleagues noted in *People v. Romero* (2006) 140 Cal.App.4th 15, 19 [43 Cal.Rptr.3d 862]: "By its plain language, the statute requires a showing of specific intent to promote, further, or assist in '*any* criminal conduct by gang members,' rather than *other* criminal conduct. (§ 186.22, subd. (b)(1), italics added.)" Thus, if substantial evidence establishes that the defendant is a gang member who intended to commit the charged felony in association with other

gang members, the jury may fairly infer that the defendant also intended for his crime to promote, further or assist criminal conduct by those gang members. (*Id.* at pp. 19–20.)

Like the *Romero* court, we reject the Ninth Circuit's attempt to write additional requirements into the statute. It provides an enhanced penalty where the defendant specifically intends to "promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) There is no statutory requirement that this "criminal conduct by gang members" be distinct from the charged offense, or that the evidence establish specific crimes the defendant intended to assist his fellow gang members in committing.

Here, substantial evidence established what appellant now concedes on appeal: that he is a member of 18th Street, a criminal street gang whose members engage in all types of crime "from simple graffiti to weapons possession, possession of narcotics, assaults, shootings involving other gang members and police officers, all the way up to and including murder." Appellant's murder of Lopez benefitted 18th Street because violent crimes like murder elevate the status of the gang within gang culture and intimidate neighborhood residents who are, as a result, "fearful to come forward, assist law enforcement, testify in court, or even report crimes that they're victims of for fear that they may be the gang's next victim or at least retaliated on by that gang . . . ." This intimidation, obviously, makes it easier for the gang to continue committing the crimes for which it is known, from graffiti to murder.

Appellant arrived at the scene of this murder with two other gang members who encouraged him to shoot Lopez despite Flores's pleas that Lopez was not a gang member. He fled the scene with the same gang members, and was assisted by other gang members and associates as he attempted to evade arrest. The murder occurred in a neighborhood claimed by three rival gangs, including appellant's, and in an alley that is scarred by gang graffiti. Lopez was only a few feet away from a piece of 18th Street graffiti that "defaced" or disrespected graffiti created by one of the rival gangs, Krazy Crowd 13. Appellant may have mistaken Lopez for a member of Krazy Crowd 13 because Lopez dressed and wore his hair in a style favored by that gang as well as by his own.

Appellant concedes that he intended to kill Lopez, and that he committed the murder for the benefit of 18th Street. A reasonable jury could also infer from the evidence that appellant specifically intended for the murder to promote 18th Street's criminal activities by intimidating neighborhood residents, retaliating against Krazy Crowd 13 for claiming 18th Street

territory, and solidifying 18th Street's control over the alley. The jury's true finding on the gang enhancement allegation is supported by substantial evidence.

## Restitution Fine

At the sentencing hearing, the trial court made this order concerning restitution: "Okay, the court is going to impose a restitution fine of $10,000 pursuant to Penal Code section 1202.4. That's to be paid from prison earnings. If actual restitution is ordered, the restitution fine will be stayed pending payment of actual restitution. If actual restitution is paid in full, all but $200 of the restitution fine will be stayed. [¶] The court will also impose a parole revocation fine of $10,000 pursuant to Penal Code section 1202.45, and that will be stayed pending completion of parole. If parole is successfully completed, it will be permanently stayed."

■ Appellant contends, and respondent correctly concedes, that the trial court erred. Section 1202.4, subdivision (f) provides that the trial court "shall require that the defendant make restitution to the victim . . . ," and that it "shall impose a separate and additional restitution fine . . . ." (§ 1202.4, subd. (b).) There is no basis in the statute for offsetting direct payments to the victim against the amount of the restitution fine, or for conditioning the amount of the restitution fine on full payment of "actual restitution." (See, e.g., *People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1535 [86 Cal.Rptr.2d 134].) In addition, section 1202.45 requires the trial court to impose a parole revocation restitution fine "in the same amount as" the restitution fine imposed pursuant to section 1202.4, subdivision (b). (*People v. Smith* (2001) 24 Cal.4th 849, 853 [102 Cal.Rptr.2d 731, 14 P.3d 942].) The trial court's order violates this rule because the amount of the restitution fine is conditioned on appellant's payment of direct victim restitution and is not, therefore, in the same amount as the parole revocation fine.

Because "a trial court has *no* choice and *must* impose a parole revocation fine equal to the restitution fine whenever the 'sentence includes a period of parole,' " we can correct the error without remanding for further proceedings. (*People v. Smith, supra*, 24 Cal.4th at p. 853.) Accordingly, we modify the judgment to impose a restitution fine, pursuant to section 1202.4, subdivision (b), in the amount of $10,000 and a parole revocation restitution fine,

pursuant to section 1202.45, in the amount of $10,000. The clerk of the superior court is ordered to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment reflecting these modified fines. As so modified, the judgment is affirmed.

Gilbert, P. J., and Perren, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 23, 2009, S177687. Werdegar, J., did not participate therein.