Filed 11/6/14  P. v. Ramos CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059611 |
| v. | (Super.Ct.No. FSB1300474) |
| JOSEPH DANIEL RAMOS, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed as modified.

Rex Adam Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Peter Quon, Jr. and Parag Agrawal, Deputy Attorneys General, for Plaintiff and Respondent.

A teenager told police that a man he knew only as "Grande" had kidnapped him. Four days later, Grande confronted the teenager as he was walking down the street, held a gun to his head, and said, "[I]f the cops . . . get him on something, he's going to bring people to [the teenager's] house." In a photo lineup, the teenager identified defendant as Grande. Defendant was a member of the East Side Colton gang.

After a jury trial, defendant was found guilty of assault with a firearm (Pen. Code, § 245, subd. (a)(2)) and forcibly dissuading a witness (Pen. Code, § 136.1, subd. (c)(1)). As to each count, a gang enhancement (Pen. Code, § 186.22, subd. (b)) and a personal firearm use enhancement (Pen. Code, § 12022.5, subd. (a)) were found true.

In a bifurcated proceeding, after defendant waived a jury, the trial court found one "strike" prior (Pen. Code, § 667, subds. (b)-(i), 1170.12) and five one-year prior prison term enhancements (Pen. Code, § 667.5, subd. (b)) true.[1] Defendant was sentenced to a total of 27 years to life in prison.

Defendant now contends that:

1. The trial court erred by refusing to allow defense counsel to cross-examine the victim and his mother about the victim's mental condition and medications.

2. There was insufficient evidence to support the gang enhancements.

---

[1] A prior serious felony enhancement (Pen. Code, § 667, subd. (a)) was also found true, but the trial court did not impose it, as we will discuss in more detail in part IV.B, *post*.

2

We have discovered two sentencing errors, which we will correct in our disposition.  Otherwise, we find no error.  Hence, we will affirm.

I

FACTUAL BACKGROUND

A.      *The Uncharged Kidnapping.*

As of January 2013, Jonathan Barrera was 16 years old and in tenth grade.  He was distantly acquainted with defendant, whom he knew only as "Grande."  He understood that defendant was a member of the West Side Verdugo gang.

On January 27, 2013, as Jonathan was walking to a friend's house, defendant drove up in a brown Cadillac and kidnapped him at gunpoint.  Defendant detained Jonathan for two days and forced him to sell marijuana on the street in Moreno Valley.[2]

Jonathan's mother, Carmen Barrera, was worried about him.  On January 28, 2013, around 4:00 a.m., she called the police.

During Jonathan's absence, Carmen received a voicemail message from a man who identified himself as "Grande."  "He said not to worry[,] that Jonathan was with him and that Jonathan was fine.  That he was going to be bringing Jonathan back when he was through with him."

---

[2]      Jonathan admitted having sold marijuana three or four years earlier, while in middle school.  He also admitted having used methamphetamine, but only once, in January 2013, and, he added, "I went straight to my principal and I told him what I had done and he called the ambulance and I got taken away.  And since then I have not touched nothing."

3

She also received a voicemail message from Jonathan, saying that Grande "was not going to let nothing happen to him as long as Jonathan d[id] whatever Grande told him to."

In the wee hours of January 29, defendant dropped Jonathan off at his home. Carmen and a police officer found him in his bedroom that morning.

Both Jonathan and Carmen were impeached with various discrepancies.

Jonathan told police that Grande had "sleeve[]" tattoos on both arms and a teardrop tattoo over the left eye. Defendant had tattoos on both arms from shoulder to elbow, but they did not go down to the forearm. He did not have a teardrop tattoo.

At trial, Jonathan testified that he did not see any tattoos on Grande. He denied telling police that Grande had sleeve tattoos; he claimed he told them that Grande was wearing a long-sleeved shirt.

Carmen testified that Jonathan disappeared after leaving the house at 11:00 a.m. However, she had told police that he left the house at 9:00 p.m.

Carmen testified that she got a voicemail from Grande. However, she told police that she actually spoke to Grande. Jonathan likewise told police that Carmen actually spoke to Grande.

Jonathan testified that defendant took him to Moreno Valley. However, he told police (and Carmen) that he had been taken to both Moreno Valley and Pomona. At trial, he explained that parts of Moreno Valley looked like Pomona to him.

4

Jonathan testified that defendant made him sell marijuana. However, he told police that defendant also made him sell cocaine.

According to Jonathan, two days after the kidnapping, defendant came to the front door and spoke to Carmen. According to Carmen, two days after the kidnapping, a person knocked on the front door, but it was Jonathan who went out and talked to the person.

B.    *The Charged Assault with a Firearm and Dissuasion of a Witness*.

On February 2, 2013, as Jonathan was walking home from the supermarket, defendant drove up again. He was in the same brown Cadillac. He got out, pushed Jonathan against a wall, and pointed a gun at his head. He said the cops were looking for him because of Jonathan. He added that "if the cops do get him on something, he's going to bring people to [Jonathan's] house."[3]

When Jonathan got home, he was pale and shaking; he started to cry. Carmen called the police.

Jonathan told police that Grande was six feet, one inch tall, weighed 200 pounds, and was 37 to 38 years old.[4] He also told them that Grande had tattoos with "faces and writing," but he had not really looked at them. At trial, he testified that he thought he

---

[3]    This is according to Jonathan's statement to the police. At trial, he testified that all he heard was "[s]omething about the cops . . . ."

[4]    According to the probation report, defendant was six feet one inch tall, 260 pounds, and 36 years old.

5

saw "glimpses" of tattoos, but he had come to believe that Grande did not really have tattoos.

Defendant had a "collage tattoo" of faces on one arm. He also had a script tattoo at his neckline, reading, "I had a choice and I chose wrong."

Jonathan picked defendant out of a photo lineup.

On February 4, 2013, the police stopped defendant's brown 1989 Cadillac and arrested him. In his car, they found "quite a few" small baggies and a digital scale. On the cell phone he was carrying, there was one text message for "Grande" and two or three for "Joe" or "Big Joe."

Once again, there were some discrepancies in Jonathan's testimony.

Jonathan told police that defendant pushed him up against a brick wall. At trial, however, he said it was a cement wall.

Jonathan testified that he bought a pineapple at the supermarket before being assaulted, but Carmen testified that he did not bring any groceries home.

C.     *Subsequent Retaliation Attempts.*

On April 8 or 9, 2013, as Carmen was walking home from school, two teenage males stole her purse. One of them punched her in the face.

About an hour later, a man phoned Jonathan and said, "Did you hear what happened to your mom?" He added, "[W]ell, that's the beginning if you testify."[5]

_____

**5**      This is according to Jonathan. According to Carmen, who heard the conversation on speakerphone, the man only said, "This is just the beginning."

The prosecution introduced recordings of phone calls that defendant had made while in jail.  In one, the woman on the other end asked him about "[t]hat name[.]" Defendant replied, "Jonathan."

In a second call, defendant gave the woman on the other end Jonathan's address, then asked her to "go down that street" . . . "and just see if that's a real address . . . ."  He said if she saw a "16 year old" named "Jon," she should tell him, "Cadillac Joe said what's up."  He cautioned her to "[c]all [me] Cadillac Joe," adding "don't ever mention" "that other name," "I don't use that . . . ."

In a third call, the woman on the other end asked, "You said . . . the last name[,] it started with a B or an H?"  Defendant replied, "B," than added, "[Ye]ah, Barrera, B-a-r-r-e . . . ."

In a fourth call, defendant referred to himself as "Grande."

D.     *Gang Evidence*.

According to a gang expert, defendant was an active member of the East Side Colton (ESC) gang.  Defendant had claimed the moniker "Joe" or "Big Joe."  However, based on the phone call from jail, the expert believed defendant's moniker was "Grande."

ESC's primary activities included shootings, robberies, narcotics sales, and unlawful possession of firearms.  Members of ESC had been convicted of murder, attempted murder, assault with a firearm, and assault with a deadly weapon, all committed between 2006 and 2009.

7

Defendant had gang tattoos, including "IE," "13," and "ES Colton." Most of them would be hidden by his clothing, but he did have a "C" for Colton on the top of his head.

Carmen and Jonathan lived in ESC territory. Thus, Jonathan was kidnapped in ESC territory, defendant pointed a gun at Jonathan and threatened him in ESC territory, and Carmen's purse was stolen in ESC territory.

## II

## REFUSAL TO ALLOW CROSS-EXAMINATION
## ABOUT JONATHAN'S MENTAL CONDITION

Defendant contends that the trial court violated the Confrontation Clause by refusing to allow his counsel to question Jonathan and his mother about Jonathan's mental condition and the medications he was taking.

A.    *Additional Factual and Procedural Background.*

At an in limine conference, defense counsel sought permission to cross-examine Jonathan about his mental health. He represented that, according to the discovery he had received, Jonathan had been diagnosed as having bipolar disorder and depression and was taking "various meds."

The prosecutor objected, "It's absolutely irrelevant unless they can show specific instances where he either exaggerated his symptoms or they resulted in him manifesting fabrications of things or hallucinations of things. And there is absolutely none of that here."

8

Defense counsel then sought permission to cross-examine Carmen about "previous instances of exaggeration or fabrication on the part of [Jonathan]." The prosecutor objected again that the evidence was irrelevant.

The trial court ruled, "[Y]ou can get into whether or not he's lied and things like that in the past," but it refused to let defense counsel ask about Jonathan's mental health in the absence of a further offer of proof.

B.    *Analysis*.

""""[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." [Citation.]' [Citation.]" (*People v. Virgil* (2011) 51 Cal.4th 1210, 1252-1253.)

"Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. [Citations.] California law is in accord. [Citation.] Thus, unless the defendant can show that the prohibited cross-examination would have produced "a significantly different impression of [the witnesses'] credibility" [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment.' [Citation.]" (*People v. Lucas* (2014) 60 Cal.4th 153, 271.)

"The trial court has broad discretion to determine the relevance of evidence [citation], and we will not disturb the court's exercise of that discretion unless it acted in an arbitrary, capricious or patently absurd manner [citation]." (*People v. Jones* (2013) 57 Cal.4th 899, 947.)

"A witness may be cross-examined about her mental condition or emotional stability *to the extent it may affect her powers of perception, memory or recollection, or communication*. [Citation.]" (*People v. Herring* (1993) 20 Cal.App.4th 1066, 1072, italics added.)  Here, the fact that Jonathan suffered from bipolar disorder and depression and was taking (unspecified) medication was irrelevant unless defense counsel could also show that these conditions affected Jonathan's credibility.  We cannot say it is a matter of common knowledge that bipolar disorder and depression typically cause delusions or hallucinations or otherwise affect credibility, and defense counsel did not offer to call an expert on this topic.

It is true that defense counsel wanted to ask either Jonathan or his mother whether his mental condition had ever caused him to be unreliable.  However, he did not claim to have any basis for a good-faith belief that they would say yes.  "It is improper to ask questions which clearly suggest the existence of facts which would have been harmful to [the other side] in the absence of a good faith belief that the questions would be answered in the affirmative, or with a belief that the facts could be proved, and a purpose to prove them, if their existence should be denied.  [Citations.]" (*People v. Chojnacky* (1973) 8 Cal.3d 759, 766.)

Defendant complains that this left him in a "'Catch 22': counsel could not ask whether the conditions could affect Jonathan's reliability because he could not show the conditions affected Jonathan's reliability." But not so. Defense counsel could have requested a hearing under Evidence Code section 402. That way, he could have examined Jonathan and/or his mother briefly, outside the presence of the jury, for the purpose of determining the effect, if any, of Jonathan's mental condition and medications. Instead, defense counsel insisted on pursuing this line of questioning in front of the jury, even though (or perhaps because) it would have invited the jury to speculate.

The trial court *allowed* defense counsel to ask about whether Jonathan had "lied and things like that in the past . . . ." This gave him an opportunity to show that Jonathan *in fact* hallucinated or was otherwise unreliable. Thus, he asked Carmen:

"Q Has [Jonathan] ever told you things that were not true?

"A As a child.

"Q Anything?

"A Yes, he has. [¶] . . . [¶] . . .

"Q Has he ever [exaggerated] to you about things?

"A Sometimes.

"Q Was he taking any medication when these things happened allegedly?

"[PROSECUTOR]: Objection.

"THE COURT: Sustained."

11

Who can say they never lied as a child?  Who can say they never exaggerate?  This did not lay a sufficient foundation that Jonathan was unreliable to allow an inquiry into his medication.

*People v. Anderson* (2001) 25 Cal.4th 543 is practically on point.  There, the trial court defense counsel asked a prosecution witness about whether she had been in therapy; the trial court sustained a relevance objection.  (*Id*. at p. 578.)  On appeal, the defendant argued that he wanted to show that the witness was in therapy for emotional problems, with a diagnosis of "mental anguish," and was taking medications.  (*Ibid*.)  The Supreme Court found no error:  "Defendant fails to demonstrate the relevance of the excluded information to [the witness]'s credibility . . . .  It is a fact of modern life that many people experience emotional problems, undergo therapy, and take medications for their conditions.  'A person's credibility is not in question merely because he or she is receiving treatment for a mental health problem.'  [Citation.]  Even if examination of a witness about treatment for mental illness might sometimes be relevant, here evidence that [the witness] had received therapy would have added little to the specific evidence, largely undisputed, that she had significant fantasies.  Defense counsel was allowed to cross-examine [the witness] fully about the specific delusions that might impair the accuracy of her testimony.  Nothing more was necessary."  (*Id*. at p. 579.)

Defendant argues that *Anderson* is distinguishable because there, defense counsel was allowed to cross-examine the witness about "specific delusions" and there was evidence that she had "significant fantasies."  (*People v. Anderson*, *supra*, 25 Cal.4th at

12

p. 579.)  Here, however, defense counsel was allowed to cross-examine about specific lies Jonathan had told in the past.  In addition, Jonathan was extensively impeached by the discrepancies between his testimony and (1) his prior statements to the police, (2) Carmen's testimony, and (3) physical facts, such as defendant's tattoos.

Evidence that Jonathan took medication for bipolar disorder and depression — in the absence of any evidence linking these conditions to his reliability — would not have produced a significantly different impression of his credibility.  Hence, excluding this evidence did not violate the Sixth Amendment.

III

THE SUFFICIENCY OF THE EVIDENCE

TO SUPPORT THE GANG ENHANCEMENTS

Defendant contends that there was insufficient evidence that the crimes were committed (1) for the benefit of, at the direction of, or in association with a gang, or (2) with the specific intent to promote, further, or assist in criminal conduct by gang members, to support the gang enhancements.

A.      *Additional Factual and Procedural Background.*

The gang expert testified that gangs are better able to get away with crimes if they intimidate residents of their "turf."  That way, the residents "know that if they witness a crime or if they're a victim of a crime and they come forward and provide that information to law enforcement that they put themselves at risk, they put their families at risk."

13

In response to a hypothetical question based on the facts of this case, he opined that defendant committed the present offenses to benefit his gang and with the specific intent to promote criminal conduct by gang members. When asked to explain, he stated: "You have a gang member. You have a firearm. You have fear and intimidation. You have the intimidation spreading throughout the community."

He added that it was "significant" that the crimes were committed in ESC territory because "that is controlling the criminal activity that occurs within that area. And acts like that will help to instill fear and intimidation within that particular area."

Finally, he testified that "instilling fear and intimidation within that victim to not report that crime" meant that "that gang member can continue on with their criminal activity."

B.     *Analysis.*

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also

14

reasonably be reconciled with a contrary finding. [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60.)

"To subject a defendant to a gang enhancement [citation], the prosecution must prove that the underlying crime was 'committed for the benefit of, at the direction of, or in association with any criminal street gang' (the gang-related prong), 'with the specific intent to promote, further, or assist in any criminal conduct by gang members' (the specific intent prong). [Citations.]" (*People v. Rios* (2013) 222 Cal.App.4th 542, 564, fn. omitted.)

"'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the Penal Code section 186.22, subdivision (b)(1), gang enhancement. [Citation.]" (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.) Moreover, "[e]xpert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of [Penal Code] section 186.22(b)(1). [Citations.]" (*People v. Albillar*, *supra*, 51 Cal.4th at p. 63.)

In *People v. Vazquez* (2009) 178 Cal.App.4th 347, the appellate court found sufficient evidence to support a gang enhancement, in part because "because violent crimes like murder elevate the status of the gang within gang culture and intimidate neighborhood residents who are, as a result, 'fearful to come forward, assist law enforcement, testify in court, or even report crimes that they're victims of for fear that

15

they may be the gang's next victim or at least retaliated on by that gang . . . .' This intimidation, obviously, makes it easier for the gang to continue committing the crimes for which it is known, from graffiti to murder." (*Id.* at p. 354.)

Here, the gang expert testified that the crimes would tend to intimidate local residents, who would be afraid to come forward and provide information to law enforcement. This was sufficient evidence to support the gang-related prong.

Defendant relies on this court's opinion in *People v. Ochoa* (2009) 179 Cal.App.4th 650 [Fourth Dist., Div. Two]. There, a two-justice majority held that there was insufficient evidence that the carjacking in that case was gang-related. (*Id.* at pp. 656-665.) We noted that "carjacking is a crime, but not one that is necessarily gang related." (*Id.* at p. 661.) We also noted that there was no evidence that the crime was committed in gang territory. (*Id.* at p. 662.)

By contrast, under *Albillar*, the crime of witness intimidation, particularly when committed by a gang member in gang territory, can be viewed as intrinsically gang-related. The victim and other residents will associate the crime with the gang and will be intimidated with respect to the entire gang.[6]

---

[6] In connection with this issue, defendant does not claim it mattered that Jonathan mistakenly believed defendant was a member of West Side Verdugo rather than ESC.

If only out of an excess of caution, we note that the jury was not compelled to conclude that *defendant* knew that *Jonathan* held this mistaken belief. Quite the contrary, it could have reasoned that defendant thought Jonathan knew he was an ESC member, because the crimes were committed in ESC territory and because defendant had a visible "C" tattoo on his head.

16

Defendant does not raise any separate or distinct argument with regard to the specific intent prong of the gang enhancement. We note that "'[i]ntent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense.' [Citation.] 'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' [Citation.]" (*People v. Rios*, *supra*, 222 Cal.App.4th at pp. 567-568.) Here, based on the expert's testimony, the jury could reasonably conclude that defendant had the specific intent, not only of intimidating Jonathan from testifying against him, but also of assisting future criminal conduct by gang members by intimidating other community members from testifying against other gang members.

IV

SENTENCING ERRORS

On our own motion, we note two sentencing errors.

A.      *Staying Two of the Prior Prison Term Enhancements*.

Five one-year prior prison term enhancements (Pen. Code, § 667.5, subd. (b)) were alleged and found true. Nevertheless, at sentencing, the trial court stayed two of these enhancements because the underlying prison terms had not been served separately.

This resulted in an unauthorized sentence. "Once [a] prior prison term is found true within the meaning of [Penal Code] section 667.5(b), the trial court may not stay the one-year enhancement, which is mandatory unless stricken. [Citations.]" (*People v. Langston* (2004) 33 Cal.4th 1237, 1241.) Rather, the enhancements should not have been

17

found true in the first place. (See Pen. Code, § 667.5, subd. (b).) Accordingly, we will strike the true findings on the two stayed enhancements.

B.    *Not Imposing the Prior Serious Felony Enhancement.*

The information alleged defendant's prior attempted robbery conviction in 2005 (1) as a strike, (2) as one of the prior prison term enhancements (Pen. Code, § 667.5, subd. (b)), and (3) as a prior serious felony enhancement. (Pen. Code, § 667, subd. (a).) The trial court found all the alleged priors true. Nevertheless, it did not impose the prior serious felony enhancement.

It is not clear why the trial court did not impose this enhancement. One reason could be that the probation report failed to mention it. Another reason, however, could be that it was also alleged as a prior prison term enhancement. The trial court may well have realized that it could not impose both a prior serious felony enhancement and a prior prison term enhancement based on the same underlying conviction. (*People v. Jones* (1993) 5 Cal.4th 1142, 1146-1153.)

As already discussed, however (see part IV.A, *ante*), the trial court stayed two of the prior prison term enhancements. One of the enhancements that it stayed was the one based on defendant's 2005 attempted robbery conviction. And, also as already discussed, that enhancement never should have been found true. With that enhancement out of the picture, the trial court had to impose the prior serious felony enhancement. The fact that the prison term for that prior serious felony overlapped the prison term that was the basis

18

of one of the remaining prior prison term enhancements was not a bar.  (*People v. Ruiz* (1996) 44 Cal.App.4th 1653, 1666-1671.)

Thus, the trial court erred by failing to impose the prior serious felony enhancement.  It had no discretion in this respect.  It could not strike the enhancement; "[a] five-year section 667, subdivision (a) prior serious felony conviction enhancement may not be stricken pursuant to section 1385, subdivision (a) or any other provision of law.  [Citations.]"  (*People v. Garcia* (2008) 167 Cal.App.4th 1550, 1560-1561.)  It had to run the enhancement consecutively.  (Pen. Code, § 667, subd. (a).)  The resulting sentence was unauthorized.

Accordingly, we will modify the sentence by adding a consecutive five-year determinate term.

V

DISPOSITION

The judgment is modified as follows.  First, the stay of two prior prison term enhancements is vacated; instead, the true findings on those enhancements are stricken.  Second, a five-year determinate term, to be served consecutively, is imposed on the prior serious felony conviction enhancement.  The judgment as thus modified is affirmed.  The clerk of the superior court is directed to prepare amended minute orders for the bifurcated trial of the priors and for the sentencing hearing, reflecting these modifications.  The clerk of the superior court is further directed to prepare an amended abstract of judgment

19

and to forward a certified copy of the amended abstract to the Director of the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
Acting P. J.

We concur:

KING
J.

MILLER
J.