Filed 7/20/15  P. v. Salinas CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>PAUL SALINAS,<br><br>        Defendant and Appellant. | D066329<br><br><br><br>(Super. Ct. Nos. SCD248635 &<br>SCD239217) |

APPEAL from a judgment of the Superior Court of San Diego County, Peter C. Deddeh, Judge.  Affirmed as modified.

Lynda A. Romero, under appointment by the Court of Appeal for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Paul Salinas pleaded guilty to possession of a deadly weapon in a penal institution (Count 1; Pen. Code,[1] § 4502, subd. (a)), and a jury convicted him of dissuading a witness by force or threat (Count 2; § 136.1, subd. (c)(1)) and threatening a witness (Count 3; § 140). The jury also found true the allegation that defendant committed Counts 2 and 3 "for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subd. (b).) The court sentenced defendant to consecutive terms of two years on each of Counts 1 and 3, an additional one year for the gang enhancement on Count 3, and 14 years to life on Count 2. Defendant challenges the sufficiency of the evidence supporting the true finding on the gang enhancement. He also contends, and the People concur, that the trial court erred by imposing separate, consecutive sentences on Counts 2 and 3 because they both arose from a single act. We conclude substantial evidence supports the true finding on the gang enhancement and affirm. However, we modify the judgment to stay the sentence under Count 3.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *The Prosecution Case*

1.       Underlying Offense

In 2012, San Diego Police Department detective Javier Padilla was investigating defendant and Marco Firman in connection with a murder.[2] Defendant and Firman were

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     It appears the jury was not informed what crime Padilla was investigating.

both documented members of the City Heights Juniors street gang. Fellow gang member David Magana agreed to cooperate with law enforcement in that investigation by wearing a recording device and attempting to obtain incriminating statements from defendant. Defendant was transferred from state prison to Magana's cell in the San Diego County jail. Magana successfully recorded a conversation in which defendant incriminated himself. Padilla arrested defendant and Firman in connection with the murder. Magana testified against defendant and Firman at the preliminary hearing in that case in June 2012.

In July 2012, defendant received an e-mail from fellow gang member Jesus Santos.[3] The e-mail discussed gang business, but also informed defendant that Santos was out on the streets with "la rata" (Spanish for "the rat"). Investigators understood this to be a reference to Magana and to the fact that he was cooperating with law enforcement. The e-mail caused the investigators to become concerned for Magana's safety.

Police then searched Santos's residence, where they found two letters defendant had written. In the second letter, dated July 30, 2012, defendant wrote: "That bitch ass fool N got me on [a wire]." Investigators understood "N" to be a reference to Magana's street name, "Nutty."

---

[3]     At the time of the e-mail, Santos was a member of the City Heights Juniors, but had not yet been formally documented as a member.

On the day Magana was expected to testify against defendant and Firman in the murder trial, the latter two were in neighboring holding cells getting dressed for court. Defendant's cell door was unlocked. At the same time, deputies were escorting protective custody inmates, including Magana, past the holding cells on the way from the jail to the courthouse. As Magana walked by defendant's cell, Firman said, "That's him." Defendant rushed out of his cell and screamed at Magana, "I'm going to get you. I'm going to get you, you snitch." Firman was also yelling. Defendant appeared tense and agitated—his hands were balled up into fists and his eyes were popped open in a violent stare. Deputies restrained defendant and returned him to his cell.

Defendant asked one of the deputies, Leslie Rhinelander, "Are they trying to make a big deal out of [the outburst]?" Rhinelander responded, "What do you think? The first people that hear about it are the department you are going to and the judge." After blaming the deputies for leaving his cell door unlocked, defendant said, "I'm going to get life anyways." When Rhinelander came to transport defendant to the courtroom an hour later, defendant said, "What do you expect me to do when someone is trying to give me life?"

2.      Gang Evidence

Steve Hobbs, a detective with the San Diego Police Department, testified as a gang expert. He described the legal attributes of a criminal street gang and opined that City Heights Juniors meets the requirements.

Hobbs has spoken with defendant and has reviewed documentation that shows defendant associates with other City Heights Juniors gang members. Hobbs looked at e-

4

mails and ledgers seized from defendant and downloaded photos from defendant's cell phone that depict defendant making gang signs. Defendant has a tattoo on his chest that reads, "City of the Heights, SD." Based on these factors, Hobbs opined that defendant was a member of the City Heights Juniors.

Hobbs testified he is also familiar with Firman and opined he is also a member of the City Heights Juniors. Hobbs characterized Firman as an upper-level member of the gang, an "enforcer" who would direct more junior members to commit crimes for him. Defendant had a lesser status in the gang than Firman.

Given a hypothetical question mirroring the facts of this case, Hobbs opined that defendant's encounter with Magana in the hallway on the way to court was gang-related and indicated a specific intent to promote, further, or assist in criminal conduct by the gang's members.

B.      *The Defense Case*

The attorney who represented defendant in the murder case testified that she "told [defendant] on several occasions that [prosecutors] did not need Mr. Magana in order to go forward with the case and could simply use the tape recording" at trial if Magana were to become unavailable.

C.      *Conviction and Sentencing*

Defendant pleaded guilty to Count 1, the jury convicted him on Counts 2 and 3, and the jury found true the gang allegations. The court sentenced defendant to consecutive terms of two years on each of Counts 1 and 3, an additional one year for the gang enhancement on Count 3, and 14 years to life on Count 2.

5

Defendant timely appealed.

DISCUSSION

I.

*SUBSTANTIAL EVIDENCE SUPPORTS THE TRUE FINDING*
*ON THE GANG ALLEGATIONS*

Defendant challenges the sufficiency of the evidence supporting the jury's true finding on the gang allegations. He asserts the "evidence is unequivocal that [his] actions were based solely on [his] anger that Magana was testifying against [him]" and were not related to his membership in the City Heights Juniors. We disagree.

A. *Legal Framework*

To prove a gang enhancement under section 186.22, subdivision (b)(1), the People must prove the defendant committed one of various enumerated felonies—including intimidating a witness—"for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subds. (b)(1) & (e)(8).) This enhancement "requires both [1] that the felony be gang related and [2] that the defendant act with a specific intent to promote, further, or assist the gang." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1138-1139.) "Not every crime committed by gang members is related to a gang." (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).)

"It is well settled that expert testimony about gang culture and habits is the type of evidence a jury may rely on to reach a verdict on a gang-related offense or a finding on a gang allegation." (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 930.) Expert opinion

6

regarding gangs may be given in answers to hypothetical questions rooted in the facts of the case at issue. (*People v. Gardeley* (1996) 14 Cal.4th 605, 617-618.)

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Albillar*, *supra*, 51 Cal.4th at pp. 59-60.) "We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Ibid.*) We do not reweigh evidence or credibility determinations. (*Ibid.*)

The California Supreme Court applied these principles to the first prong of the gang enhancement in *Albillar*, *supra*, 51 Cal.4th 47. In that case, three gang members challenged the sufficiency of the evidence supporting the gang enhancement on their convictions for forcible rape while acting in concert and forcible sexual penetration while acting in concert. (*Id.* at p. 50.) Defendants Albert and Alex Albillar were twin brothers, and defendant John Madrigal was their cousin. (*Id.* at p. 51.) Albert was alone in a bedroom with 15-year-old Amanda, where he kissed her and removed her jeans. (*Id.* at pp. 51-52.) When Alex and Madrigal opened the bedroom door and asked if they could " 'get in,' " Amanda yelled, " 'No. Get out.' " But Albert moved off of Amanda and

7

grabbed one of her legs, Madrigal grabbed the other, and Alex climbed on top of Amanda and digitally penetrated and raped her. (*Id.* at p. 52.) Albert and Madrigal then took turns digitally penetrating and raping Amanda. (*Id.* at pp. 52-53.) The defendants then drove her home. (*Id.* at p. 53.) Amanda was initially reluctant to tell anyone what had happened because she knew the defendants were gang members and feared they would retaliate against her family. (*Ibid.*) After Amanda told her sister and some friends what happened, the girlfriend of another gang member called Amanda to warn her that Amanda and her family could be hurt if they reported the crime to the police. (*Id.* at p. 53.) Amanda finally told her parents what happened, and they notified the police. (*Ibid.*)

At trial, a gang expert testified that status and respect were two of the most important elements of gang membership. (*Albillar*, *supra*, 51 Cal.4th at p. 60.) Gang members gain status by committing crimes and assisting other gang members in doing so. (*Id.* at p. 53.) Gang members commit crimes together to increase their chance of success, bolster their confidence in one another, and enable participants to boast about their accomplishments to others who were not present. (*Ibid.*) Gang members know, "because of the nature of the gang, that no one would be a 'rat,' which would be 'one of the worst things, if not the worst thing the gang can have within itself.' " (*Id.* at p. 61.) Conversely, the expert testified that gang members lose status by not supporting gang members in committing crimes. (*Id.* at p. 53.) Gang members also rely on intimidation and violence to gain respect. (*Ibid.*) In response to a hypothetical mirroring the facts of the rape, the

8

detective opined it was committed for the benefit of, at the direction of, or in association with, a criminal street gang. (*Id.* at pp. 53-54.)

The California Supreme Court concluded substantial evidence supported the finding that the gang members committed the charged offenses "in association" with a gang. (*Albillar*, *supra*, 51 Cal.4th at p. 62.) The court stated, "Defendants not only actively assisted each other in committing these crimes, but their common gang membership ensured that they could rely on each other's cooperation in committing these crimes and that they would benefit from committing them together. They relied on the gang's internal code to ensure that none of them would cooperate with the police, and on the gang's reputation to ensure that the victim did not contact the police." (*Id.* at pp. 61-62.) "Defendants also knew that fear of the gang would prevent Amanda from reporting the incident to the police." (*Id.* at p. 61.) The court found this constituted substantial evidence "that defendants came together *as gang members* to attack Amanda M. and, thus, that they committed these crimes in association with the gang." (*Id.* at p. 62.) In response to the defendants' argument that they cooperated with each other not because they were gang members but because they were family and lived together, the court stated, "the jury, which was presented with the competing inferences, was entitled to credit the evidence that the attack on Amanda M. was gang related, not family related." (*Id.* at p. 62.)

The Supreme Court also found substantial evidence supported the finding that the defendants' crimes were "committed to benefit" their gang. (*Albillar*, *supra*, 51 Cal.4th at p. 63.) The court cited the gang expert's testimony that by committing crimes together,

9

the gang members not only enhanced their individual reputations, but " 'the overall entity benefits and strengthens as a result of it.' " (*Ibid*.) The court also relied on the expert's opinion that the gang benefited by " 'elevating [its] reputation to be a violent, aggressive gang that stops at nothing and does not care for anyone's humanity.' " (*Ibid*., citing *People v. Vazquez* (2009) 178 Cal.App.4th 347, 354 [relying on expert opinion that the murder of a nongang member benefited the gang because "violent crimes like murder elevate the status of the gang within gang culture and intimidate neighborhood residents who are, as a result, 'fearful to come forward, assist law enforcement, testify in court, or even report crimes that they're victims of for fear that they may be the gang's next victim or at least retaliated on by that gang' "].)

B.    *Analysis*

Substantial evidence supports the finding that defendant's actions satisfied the first prong of the gang enhancement—that defendant committed the crime "for the benefit of, at the direction of, or in association with any criminal street gang." (§ 186.22, subd. (b)(1).) Detective Hobbs testified that witness intimidation "happens in every case where we have witnesses involved," and gangs benefit from it because police are forced to drop "a lot of cases" as a result. Hobbs also testified that gangs benefit from secrecy and trust, and repercussions—including death—are expected for gang members who violate those principles. That defendant and Santos's communications referred to Magana as "the rat," and defendant called Magana a "snitch" during the intimidation incident support the inference that defendant's conducted benefitted the City Heights Juniors by enforcing its norms and customs regarding loyalty and secrecy. (See, e.g., *Albillar*, *supra*, 51 Cal.4th

10

at p. 61 ["Defendants knew, because of the nature of the gang, that no one would be a 'rat,' which would be 'one of the worst things, if not the worst thing the gang can have within itself' "].)

Firman's alerting defendant to Magana's presence supports a finding that defendant acted "in association with" his gang. Defendant's immediate action supports the inference that he and Firman had previously discussed the issue. Firman's yelling during the incident further supports the inference that he and defendant acted "in association with" each other.

Alternatively, Defendant's immediate response to Firman saying "that's him" supports a finding that defendant acted "at the direction of" his gang. This finding is consistent with Hobbs's testimony that "older status [gang] members . . . have the ability to direct activity of younger members[.] [¶] They want something done, you have to go do it. You don't argue the point. You just do what they say."

When asked a hypothetical question based on the facts of this case, Hobbs responded with the opinion that the perpetrator's conduct "would definitely be for the benefit of the street gang" and "would be in association with a street gang." This further supports the jury's finding. (*Albillar*, *supra*, 51 Cal.4th at p. 63 ["Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' "].)

Defendant's primary argument against the jury's finding on the first prong of the gang enhancement is that his "actions against Magana were not gang related but were

11

instead personal"—after all, Magana "was trying to give [defendant] life." We are not persuaded. First, under the substantial evidence standard of review, we will not disturb a jury's finding "simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Albillar*, *supra*, 51 Cal.4th at pp. 60, 62 ["the jury . . . was entitled to credit the evidence that the attack on Amanda M. was gang related, not family related"].) Second, defendant's argument is undermined by his own evidence. His counsel in the murder trial testified that she advised him that the incriminating recording would be admitted at trial regardless of whether Magana testified. Thus, the jury could reasonably infer that defendant's conduct was not motivated by a desire to alter the outcome of the murder trial, but rather, to punish Magana and restore the gang's reputation and credibility.

The substantial evidence discussed in connection with the first prong of the gang enhancement also defeats defendant's substantial evidence challenge to the second prong. In addition, Hobbs opined in response to a hypothetical question rooted in the facts of this case that the perpetrator's conduct indicates an intent "to promote, further, and assist criminal conduct by the City Heights Juniors" by "mak[ing] it known right then and there we are going to continue to do business in the jail even though we are locked in the jail[,] not on the street corner. We are still holding ground."

In attacking the jury's finding, defendant relies on scenarios "where a defendant acts alone." Those scenarios are inapposite because substantial evidence supports the inference that defendant did not act alone, but rather, acted in association with fellow gang member Firman.

12

Defendant's remaining challenge—that "his intent was clearly to avenge Magana's testimony against him"—is essentially a reiteration of his attack on the first prong. It fails for the same reasons discussed above.

Finally, defendant's reliance on cases in which appellate courts reversed gang-enhancement findings is misplaced. Generally, "[r]eviewing the sufficiency of evidence . . . necessarily calls for analysis of the unique facts and inferences present in each case, and therefore comparisons between cases are of little value." (*People v. Rundle* (2008) 43 Cal.4th 76, 137, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Proving this point, three of the four cases that defendant cites are distinguishable on the basis that the defendant acted alone. (*People v. Rios* (2013) 222 Cal.App.4th 542, 572 ["But in this case, defendant was acting alone. There is no evidence he had any accomplices"]; *In re Daniel C.* (2011) 195 Cal.App.4th 1350, 1361 ["there is no evidence that he acted in concert with his companions"]; *People v. Ochoa* (2009) 179 Cal.App.4th 650, 662 ["Defendant was not accompanied by a fellow gang member"].) In the fourth, *People v. Ramon* (2009) 175 Cal.App.4th 843, the defendant was convicted of, among other things, receiving a stolen vehicle and possession of a firearm by a felon. The court found the evidence that the perpetrators were gang members and that the crime was committed in the gang's territory was insufficient to support the gang enhancement. (*Id.* at p. 852.) The court noted its analysis might be different if the expert's opinion had included possessing stolen vehicles as one of the gang's activities. (*Id.* at p. 853.) By contrast, Detective Hobbs testified here that witness intimidation is standard operating procedure in gang cases that involve a witness.

13

In sum, substantial evidence supports the jury's true finding on the gang allegations.

## II.

*DEFENDANT'S SENTENCE ON COUNT 3 IS STAYED*

Defendant contends—and the People concur—that the trial court erred by imposing separate, consecutive sentences on Counts 2 and 3. We agree.

The prosecutor acknowledged below that Counts 2 and 3 were based on "one act." He argued, however, that defendant could be sentenced separately under each count because defendant acted with a different intent under each—defendant's intent in committing Count 2 was to dissuade Magana from testifying against him at trial, while the intent in committing Count 3 was to intimidate Magana for his previous testimony at the preliminary hearing. The trial court agreed.

Section 140, which is the basis for Count 3, is dispositive. It provides in subdivision (b): "A person who is punished under another provision of law for an act described in subdivision (a) shall not receive an additional term of imprisonment under this section." Because it is undisputed that defendant was punished in Count 2 under section 136.1, subdivision (c)(1), "for an act described in [section 140,] subdivision (a)," defendant should not have received an additional punishment under Count 3. Accordingly, we stay defendant's sentence under Count 3.

## DISPOSITION

The sentence imposed on Count 3 is stayed. The superior court is directed to amend the abstract of judgment to reflect this modification and to forward the amended

14

abstract of judgment to the Department of Corrections and Rehabilitation.  In all other

respects, the judgment is affirmed.


BENKE, Acting P. J.

WE CONCUR:


NARES, J.


HALLER, J.